UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

----------------------------------------------------------------

UNITED STATES OF AMERICA,       )
                               )
               Plaintiff,    )    Case No. 22-CR-26
                               )    Milwaukee, Wisconsin
    vs.                   )
                               )    October 24, 2025
LENARD MONROE,             )
                               )    **(Excerpt transcript.)**
               Defendant.    )
                               )

----------------------------------------------------------------

### TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE PAMELA PEPPER
UNITED STATES CHIEF DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff
UNITED STATES OF AMERICA:    United States Department of
                                Justice
                                By: Erica J Lounsberry & Elizabeth
                                Monfils
                                517 E Wisconsin Ave - Rm 530
                                Milwaukee, WI 53202
                                Ph: 414-297-1700
                                Fax: 414-297-1738
                                Erica.lounsberry@usdoj.gov
For the Defendant
LENARD MONROE:              Kravit Hovel & Krawczyk SC
(Present)                  By: Brian T Fahl
                                825 N Jefferson St - 5th Fl
                                Milwaukee, WI 53202-3721
                                Ph: 414-271-7100
                                Fax: 414-271-8135
                                Btf@kravitlaw.com

U.S. Official Reporter:    SUSAN ARMBRUSTER, RPR, RMR, FCRR
Transcript Orders:       Susan_Armbruster@wied.uscourts.gov

Proceedings recorded by computerized stenography,
transcript produced by computer aided transcription.

```
                    T-R-A-N-S-C-R-I-P-T    I-N-D-E-X

                                                          Page
                                WITNESSES
ALL WITNESSES:

  For the Defendant:

    Lenard Monroe

    Direct Examination by Mr. Fahl:          3 -  75
    Cross Examination by Ms. Lounsberry:    76 - 159
```

1          (Excerpt transcript.)

2               MR. FAHL:  Yes, Your Honor.  The defense calls

3     Mr. Monroe.

4               THE COURT:  All right.  Mr. Monroe, if you'll come up.

5     Step up to the stand.

6               Lenard Monroe, being first duly sworn to tell the

7     truth, the whole truth, and nothing but the truth, testified as

8     follows:

9               MR. MONROE:  I do.

10              THE COURT:  Have a seat.  Just like I've asked

11    everybody else, if you make sure the mic is pulled up nice and

12    close to you so we can hear you.  The chair does not move.  So

13    tell us your name and spell your last name, please.

14              DEFENDANT:  My name is Lenard Monroe.  My last name is

15    M-o-n-r-o-e.

16              THE COURT:  Go ahead, Mr. Fahl.

17    **DIRECT EXAMINATION BY MR. FAHL:**

18    Q.  Good morning, Mr. Monroe.

19    A.  Good morning.

20    Q.  How old are you?

21    A.  I'll be 52 on December 19th.

22    Q.  How far did you go in school, Mr. Monroe?

23    A.  I received my HSED.

24    Q.  Where are you from?

25    A.  I was born in Chicago, Illinois, but I resided in Milwaukee

1    probably since I was two years old.

2    Q.  Do you have any family?

3    A.  Yes, I have four children.  I have a 32-year old son --  No,

4    33.  My daughter is 32, 25 and 14 and four grandchildren and one

5    on the way.

6    Q.  Can you tell me a little bit about your occupation history,

7    what you've done since you've stopped going to school.

8    A.  Well, my first profession I was a barber.  I started cutting

9    hair.  My grandfather gave me a pair of clippers.  I started

10   cutting hair when I was in high school and that lasted probably

11   until I was about 35.

12   Q.  Okay.  And then what did you do?

13   A.  After --  Well, I basically did things in-between while

14   being a barber.  I got incarcerated in 2003, and I was released

15   from federal prison in 2010 for drug convictions, So I was

16   released --

17   Q.  I am going to --  I know it is -- I will jump in and kind of

18   direct you a long a little bit.

19   A.  I'm sorry.

20   Q.  You were in prison for a drug conviction starting in 2003?

21   A.  Yes.

22   Q.  What was prison like?

23   A.  Well, for me because I changed my life before I went to

24   prison, it was just prior convictions that is a statute of

25   limitations when you're dealing drugs, so I had --  I got

1    indicted while I had changed my life.  So prison -- I mean, it
2    was a hard situations because at the time I was married to my
3    first three kids' mother.  So separated from them was kind of
4    hard.  You know, I got incarcerated for what I was guilty of.
5    But not to bring spirituality into the situation, but I gave my
6    life to the Lord two years before I got indicted.

7             So it was hard because I was away from my family, but
8    I had a chance to study the Bible, and I had a lot of good
9    Christian brothers, so it was a really good learning experience
10   and transition for me in life, so I applied to that.

11            It is kind of like, you know, you think things are
12   hard but in hindsight when you look at things, it's kind of like
13   the situation worked for my benefit because I had a chance to
14   have a relationship with God, and it really instilled a lot of
15   principles in me as far as my character is concerned.

16   Q.  Okay.  So then you got out of prison in 2010?

17   A.  Yes, I did six and-a-half years.  I got out in 2010.

18   Q.  And then what did you do?

19   A.  I cut hair.  I was a barber.

20   Q.  For how long did you do that?

21   A.  Until --  Well, I got out --  I mean, I'm sorry.  I was 36.
22   I said I start cutting hair stopped cutting hair when I was 35.
23   I meant to say I stopped cutting hair in 2015.  I'm sorry, I got
24   a lot on my mind.  So I cut hair and --  Well, I started a
25   transportation business.

5

1  Q.  Let's talk about that.  What kind of transportation

2  business?

3  A.  Medical transportation.

4  Q.  What would you do with medical transportation?

5  A.  We would pick up people that were --  that needed rides to,

6  like, medical appointments and what not.

7  Q.  How long did you do that?

8  A.  Let me see.  I got out in 2010.  Probably until -- Probably

9  a year.

10 Q.  Okay.  Eventually you formed a company called Wellness

11 Personal Cares.

12 A.  Uh-huh.

13 Q.  When was that?

14 A.  We started Wellness Personal Cares in 2017, actually formed

15 an LLC in 2017.

16 Q.  Okay.  And what kind of company is that?

17 A.  Personal care agency.

18 Q.  And what does a personal care agency do?

19 A.  Personal care agency basically does in-home services for

20 people that need in-home services.  It's basically, like, the

21 state is just paying the agency to manage employees and to make

22 sure that people that need in-home services are served in home.

23 Q.  Why did you decide to open up a personal care agency?

24 A.  Well, my cousin she had prior -- She had a personal care

25 agency before we decided to open -- before I decided to open up

1    a personal care agency with her.

2    Q.  Is that Tammy Virgil?

3    A.  Tammy Virgil, yeah.

4    Q.  So she had operated a personal care agency before that?

5    A.  Yeah, she -- Community Care is a very successful personal

6    care agency.

7    Q.  Do you know how long she ran that agency?

8    A.  I think it stayed open for probably ten years.

9    Q.  And why did she want to open an agency with you?

10   A.  Well, her agency got closed because of some inside things

11   that went on with her agency, so it got closed.  So I called her

12   and asked her would she be interested in opening an agency with

13   me.

14   Q.  What sort of inside things caused it to be closed?

15   A.  Well, from what she explained to me, she had an employee

16   that took --

17            MS. LOUNSBERRY:  Objection, hearsay.

18            THE COURT:  Sustained.

19   Q.  If you're aware, was it closed due to fraudulent billings by

20   her?

21   A.  No, no.

22   Q.  So you decided to open up a personal care agency, the two of

23   you, right?

24   A.  Sure.

25   Q.  Did you know much about a personal care agency before you

1  started opening it with your cousin?

2  A.  No, I didn't have a clue.

3  Q.  And she had been running one for ten years?

4  A.  Yes.

5  Q.  She knew how to run it?

6  A.  Correct.

7  Q.  Did she create the forms?

8  A.  She created the policies and procedures, yes, and helped me

9  with the application.

10  Q.  And she helped you fill out the application?

11  A.  Correct.

12  Q.  I'm going to refer you to what's previously been admitted

13  and published as Exhibit 5.  Can you see that?

14  A.  Yeah.

15  Q.  This is the provider agreement and acknowledgement and terms

16  of participation?

17  A.  Yes.

18  Q.  And down here at the bottom where it says signature, that's

19  your name?

20  A.  Yes.

21  Q.  And your title is?

22  A.  Administrator.

23  Q.  What did you mean by administrator?

24  A.  I guess that's --  Well, that's what the DHS calls the

25  owner.  So basically, you're just like an office administrator

1    basically.  That's the title of basically the owner.

2    Q.  And but you were not the sole owner of Wellness Personal

3    Cares, correct?

4    A.  Correct.

5    Q.  Who else was an owner?

6    A.  Tamisha Williams, but my cousin, Tammy, was a silent

7    partner.

8    Q.  Can you describe that.  What do you mean by a silent

9    partner?

10   A.  She just wanted Tamisha name to be on the forms and

11   documents because, you know, she was going through a divorce,

12   and her ex-husband was trying to attack her financially, so she

13   just didn't want to have her name involved in anything that

14   would affect her financially.

15   Q.  So she put it in her daughter's name?

16   A.  Correct.

17   Q.  But she maintained the kind of half control of the agency?

18   A.  Correct.

19   Q.  Would you say it was an equal partnership?

20   A.  Yes, 50/50.

21   Q.  Can you describe what each of your roles were in the

22   company?

23   A.  Um, Tammy name actually was on the agency as the registered

24   nurse because you have to have a registered nurse in order to

25   have a personal care agency.  Basically so, um, I just handled

1    most of the office --  well all of the office paperwork because

2    I was in the office, and I handled, like, dealing with calling

3    doctor's offices, filing paperwork, and I from time-to-time

4    would hire someone to work in the office with me to do

5    paperwork.

6            Her primary job was basically to -- She would fax

7    doctor's orders to receive progress notes and doctor's orders.

8    She would check if she had to do admission.  Initially, we

9    didn't have a nurse right away so she came to down and she did

10   admissions.  But when we got another nurse, she allowed the

11   other nurse to do the admission, and I would send her the

12   paperwork.  I would email her paperwork from the nurse that did

13   the physical admission, and she would take that information and

14   put it in what is called PCST, personal care screening tool, and

15   she would basically just put all the cares and the ADL's of the

16   client in the screening tool.  She would fill out the 485, the

17   plan of care.

18   Q.  We'll break these down.  So just to be helpful, you're

19   tending to go on kind of long.  So to make it easier for the

20   jury to understand, I'm going to ask you a question.  Just

21   answer the question, and I'll ask another one that will

22   hopefully make this go on.

23   A.  Sorry about that.

24   Q.  So it sounds like -- Would it be fair to summarize your

25   answer is that Tammy did the medical sort of provider portion of

10

1  this, and you were more administrative?

2  A.  Yeah, she did that, and she also handled the billing, but we

3  did payroll together.

4  Q.  And any major decision that you made regarding the company,

5  would you involve Tammy in that decision?

6  A.  Absolutely.  I wouldn't of had it no other way.

7  Q.  And would she have 50 percent, you know, decision-making

8  ability?

9  A.  Of course.  I basically wouldn't do too much without her

10  decision because she had more experience.

11  Q.  Now, turning you back to Exhibit 5.  You see that there are

12  five pages, five-and-a-quarter pages of terms and conditions?

13  A.  Okay.

14  Q.  Do you remember reading those before you signed the

15  document?

16  A.  I'm going to be honest, and my mama used to tell me this all

17  the time as a kid.  Boy, make sure you read the information.

18  Now, did I read it thoroughly?  I can't say I read it

19  thoroughly, I've got to be honest.  I probably glanced over it

20  and put my signature on it making sure everything was signed.

21  Q.  And did you hear testimony throughout this trial about the

22  existence of a provider's handbook?

23  A.  Yes.

24  Q.  Did you read the handbook?

25  A.  I didn't read the handbook.

1    Q.  Why not?

2    A.  I just relied on my cousin knowledge.  I just wanted to make

3    sure everything else was done.  The only thing -- I'm not trying

4    to --  The only thing I really had patience sitting down and

5    reading was the Bible honestly.

6    Q.  So if you had questions about how something should be done,

7    how would you find an answer to that question?

8    A.  I mean, if I had to feel like I had to do research, I just

9    ask my cousin.

10   Q.  Now, you said that Wellness Personal Cares was incorporated

11   in 2017?

12   A.  Yes.

13   Q.  And the provider agreement was signed in 2018?

14   A.  Yeah, because we formed --  Well, actually I actually did

15   the LLC form.  I did it, like, probably late October, so it was

16   probably at the end of the year.

17   Q.  And then when did Wellness Personal Cares start seeing

18   patients?

19   A.  Well, probably, if I'm not mistaken, it was so long ago.  It

20   probably took about six months to get final approval cause we

21   had to get approval for DHS for the agency, and then we had to

22   get Medicaid approval after that.

23   Q.  So you think some time halfway through 2019?

24   A.  Yeah, probably.

25   Q.  So I'm going to start talking about the client-intake

1    process.

2    A.   Excuse me.  Go ahead, I'm sorry.  Sorry, go ahead.

3    Q.   I'm going to start talking about the client-intake process,

4    what happens when a client comes in.

5    A.   Yeah.

6    Q.   I understand that there are kind of two sets of clients I

7    will put it.  One, is going to be clients that you found on your

8    own and clients that were referred to you.

9    A.   Right.

10   Q.   If I'm asking a question and there's a distinction, I don't

11   want you to generalize.

12   A.   Okay.

13   Q.   So a client comes to you looking for personal care services.

14   What's the first thing that you would do?

15   A.   I would ask for their name, address, doctor's information, I

16   think date of birth, and mainly the doctor's office and fax

17   number was really important, and I would fill that out on a

18   referral form sheet, and I would put the date.

19          I would actually put their information into the DHS

20   portal to see what insurance they carry and see if the

21   insurance -- see if it was valid, and so that's the information

22   I would get.

23   Q.   After you've completed that, you determined that they are

24   eligible for services, what happens next?

25   A.   So I would send a referral form to Tammy, and she would send

1  a doctor's order to request progress notes and a doctor's

2  signature.

3  Q.  And how long would it generally take for a doctor's office

4  to return those to Wellness Personal Cares?

5  A.  It varies.  A lot of times I would have to call doctors'

6  offices and request and see what is the time concern.

7  Q.  And then eventually you get that information?

8  A.  Correct.

9  Q.  Or you don't.

10 A.  Or you don't.

11 Q.  But assuming that you get it, what happens next?

12 A.  So the doctor's office would fax the progress notes and the

13 signed physician's orders to the office.  When I get the

14 progress notes, I would call the active nurse that travels on

15 site to go do the admission.  I created the admission folders in

16 the office, and I would put the progress notes in the admission

17 folder with the client's information on the admission folder so

18 that the nurse can get in touch with the client.

19 Q.  So then the nurse would come to your office?

20 A.  Yes.

21 Q.  And they would pick up the folder with the information?

22 A.  Yes.

23 Q.  So they could review the medical information before they did

24 their evaluation?

25 A.  Correct.

1  Q.  And then the nurse would go to the client's house?

2  A.  Correct.

3  Q.  What was the nurse supposed to do when they got to the

4  client's home?

5  A.  So I was a stickler about -- well not even me, but the

6  nurses really were sticklers about -- They had to physically see

7  the client.  They couldn't just call the client.  When doing the

8  admission, they had to physically go see the client, so they

9  would go see the client even during COVID.  So during COVID,

10  they were able to call and speak about the ADLS over the phone,

11  you know, the active daily living situation, like, the prognosis

12  so on and so forth.

13        But to get the wet signature for the client, they had

14  to actually go see the client and make sure that the client was

15  actually a client and actually having the physical aliments they

16  say they had.

17  Q.  You said you employed nurses.  What are the names of the

18  nurses that Wellness Personal Cares employed?

19  A.  The first nurse was Melissa Stewart, and the second nurse

20  was Annie Smith.

21  Q.  You testified that Tammy Virgil did some initial

22  evaluations?

23  A.  Correct.

24  Q.  And then so when the nurses go there and evaluate the

25  potential client, what information are they supposed to convey

1  back to Wellness Personal Cares?

2  A.  Well, basically they would just -- One of the things they

3  had that was important was the HIPAA agreement.  They got the

4  HIPAA agreement because the HIPAA agreement would allow --  I

5  think we had to send that to the doctor for the -- really get

6  the doctor's signature on the plan of care.

7         But basically, they would bring the admission back to

8  the office signed.  I would go through the admission, and I

9  would send Tammy whatever documents that she needed to be sent

10  to her so that she can do the plan of care.

11  Q.  So what documents would Tammy need from your office to do

12  the plan of care?

13  A.  Um, I think the personal --  the personal care work.  I

14  don't remember the name of the sheets.  It was, like, five

15  different sheets.

16  Q.  What sort of information would be on those sheets?

17  A.  It would be -- Like from my understanding, it would be,

18  like, the ADLS of the client.

19  Q.  It would be information about what the nurse observed the

20  client can and cannot do?

21  A.  Correct.

22  Q.  Things like that?

23  A.  Correct.

24  Q.  All right.  Once that information is given back to you, you

25  said you transfer it to Tammy.  Then, what does Tammy do?

1  A.  She does the plan of care.  She puts everything in the

2  personal care screening tool called a PCST, and then she would

3  create a plan of care, a 485.

4  Q.  And what in kind of plain terms, what is a plan of care?

5  A.  A plan of care is something that the doctor has to sign off

6  on to basically say it's okay for the client to receive services

7  or not from my understanding.

8  Q.  And does the plan of care specify the services that the

9  client or patient is going to need?

10  A.  Yeah, it specifies.  And I think, if I'm not mistaken, it

11  specifies the amount of hours that the client would need

12  services.

13  Q.  Okay.  You said that goes to a doctor for approval?

14  A.  Yes.

15  Q.  And you wait until you get the approval back?

16  A.  Well, yeah, Tammy would email me the plan of care, and I

17  would have to fax the plan of care to the doctor's office, and

18  we had wait for the doctor's signature in the plan of care.

19  Q.  And then what happens after you get the signature back?

20  A.  When we get the plan of care, I think -- Do I send that back

21  to Tammy?  I don't know if I send that back to her or she has it

22  already, but she admits in the DHS portal what is called a prior

23  authorization.  We called it a PA, so it's basically a request

24  for services for a client.

25  Q.  And then you wait for approval from Medicaid?

1    A.  Correct.

2    Q.  While waiting for approval, can caregivers provide service

3    to the person who has applied?

4    A.  Yes.

5    Q.  So let's talk about caregivers.  What point during this

6    process is a caregiver assigned?

7    A.  Well, for the most part, most of the clients that -- Most of

8    the clients I had, they would call over the phone, and they

9    would request services.  And most of them, the caregiver would

10   probably be a family member or a friend, so they would be

11   familiar with the client.

12           So basically, the caregiver would come to the office

13   and -- What I give them?  I had to have also the caregiver's

14   address so that I can do a MapQuest as well because I had to do

15   the MapQuest for travel time.

16           So I would -- They would come to the office, and I

17   would have them fill out an application ahead of time and kind

18   of explain to them the situation.  And a lot of times, I kind of

19   tried to gauge the employee.  I didn't want to tell them that

20   they could get paid for services, back pay, because they would

21   probably try to, you know, lie and say their services whatever.

22           They would basically come to the office and, you know,

23   I would give them the application and tell them -- I would let

24   them know when services get approved.

25   Q.  They filled out an application.  Who approves whether or not

1  they can be a caregiver?

2  A.  That was my job.  I would have to do a background check and

3  do a background check.

4  Q.  How do you do the background check?

5  A.  It was a portal on the computer.  It was a portal.  You put

6  the information in, and the portal will let you know the

7  person's background.

8  Q.  Was that the DHS portal?

9  A.  No, that's not the DHS portal, that's a different portal.

10  Q.  If they pass the background check, what happens?

11  A.  If they pass the background check, I would let them know

12  they were eligible for personal care worker service.

13  Q.  Would you put them --  Does their information go into the

14  DHS system at some point?

15  A.  Yeah, I tried to keep up with that as much as I could.  I

16  would have to put their information into the DHS portal.

17  Sometimes I would be behind on it.  But for the most part, yeah.

18  Q.  I'm going to show you what's been admitted as Exhibit 104,

19  not previously published.

20          MR. FAHL:  Ask that it be published.

21          MS. LOUNSBERRY:  No objection.

22          THE COURT:  You may publish 104.

23  Q.  Mr. Monroe, I'm going to scroll through this quick.  Do you

24  recognize what's all in Exhibit 104?

25  A.  That's an admission.  All kind of stuff we explained, plan

1    of care, timesheets.

2    Q.  So you saw that.  What would you call this document?

3    A.  That would be the first document or just the whole?

4    Q.  The whole thing.

5    A.  Admission.  Admission for a client.

6    Q.  This whole thing, including the timesheets, would be the

7    admission packet?

8    A.  Yes.

9    Q.  Including all the filled-out timesheets?

10   A.  Well, the timesheets, they wasn't in the admission package

11   until services were rendered.

12   Q.  So I guess what I'm asking, you see these two punch holes on

13   the top?

14   A.  Correct.

15   Q.  Did you put those punch holes on the documents?

16   A.  Yeah.

17   Q.  And why would you do that?

18   A.  So that -- cause we had folders, and we had these -- We had

19   to keep --  We had to keep paper client files in the office so

20   we had to just store them, and we had old folders, cheap.

21   Q.  And so if all these -- Would the documents that have the

22   punch holes be things that are included in that folder?

23   A.  Yeah.  Well, after -- Yeah, yeah, they all should have punch

24   holes in them because I would do it so --

25   Q.  And then would that be all documents relating to that

1  particular client?

2  A.  Yeah.

3  Q.  Would documents for that particular client be located

4  somewhere else?

5  A.  Um, no, not necessarily.  Maybe if it was, like -- Some time

6  I would have, like, timesheets that wasn't filled out right just

7  sitting around the office before I shred them, but I tried to

8  keep the office in order for the most part.

9  Q.  So would it be fair to call this Ricky Kilgore's client

10 file?

11 A.  Yes.

12 Q.  So let's talk about the first page.  What is this?

13 A.  Well, that's the Wellness Personal Care client file.

14 Q.  It is the client profile?

15 A.  Profile, yeah.

16 Q.  And is this what you would fill out when somebody came in

17 the office?

18 A.  No, not that.  That's the nurse.

19 Q.  So who fills out this document?

20 A.  The nurse.

21 Q.  And is this when they go and visit the client the first

22 time?

23 A.  Correct.

24 Q.  And that's just basic personal information?

25 A.  Correct.

1   Q.  And it's signed by the client and the nurse?

2   A.  Correct.

3   Q.  What's this?

4   A.  I guess it says Wellness Personal Care chart signature log.

5   Q.  What is the purpose of this?

6   A.  That's the nurse.  I've never --  The nurse -- That was a

7   part of the admission packet.

8   Q.  You didn't do anything with this document?

9   A.  No, just filed it.

10  Q.  What's this document?

11  A.  That's a grievance form.

12  Q.  And what was the purpose of the grievance form?

13  A.  So that if the client has any problems, they can give the

14  office a call and let us know so that we can rectify it.

15  Q.  And it has your name?

16  A.  Correct.

17  Q.  Your phone number?

18  A.  Office phone number, correct.

19  Q.  And then, it also tells you that they can go somewhere else

20  if they can't reach you; is that correct?

21  A.  I never --  I apologize, I never read that but apparently,

22  yes.

23  Q.  If they can't reach you, they're not satisfied, they can go

24  to the Bureau of Health Services Division of Quality Assurance?

25  A.  Correct.

1  Q.  And the client signed this?

2  A.  Correct.

3  Q.  Does the client get a copy of this?

4  A.  Yes.

5  Q.  So any client who signed up for services at Wellness

6  Personal Care should have a copy of this?

7  A.  Correct.

8  Q.  And what's this document?

9  A.  It's client emergency or disaster plan.

10  Q.  What's the purpose of this document?

11  A.  I guess if the client has a problem or an emergency, so that

12  they can contact us in case of emergency.

13  Q.  So you can contact the doctor's name?

14  A.  Or call an ambulance.  That happened before.

15  Q.  And what is the Wellness Personal Care Service Client

16  Agreement?

17  A.  That's self explanatory, it's a client agreement.

18  Q.  Is that something that Wellness Personal Care drafted, or is

19  that something that comes from Medicaid?

20  A.  I'm not sure.  Tammy created the admission, so it may come

21  from Medicaid, so I don't know.

22  Q.  Did you review this -- ever review this in depth?

23  A.  No.

24  Q.  How about the client rights, are you familiar with this?

25  A.  Yes.

1   Q.  And again, is this something -- Do you know whether this is

2   something that Medicaid provided or that Tammy created?

3   A.  I'm not sure if she created or Medicaid provided.

4   Q.  Have you read through this document?

5   A.  No.

6   Q.  Again, it's signed by the client and the nurse?

7   A.  Correct.

8   Q.  So that this would be done on the initial --

9   A.  Admission, yeah.

10  Q.  You have a Client Responsibility Agreement?

11  A.  Correct.

12  Q.  And that is also signed by both the client and the

13  evaluating nurse?

14  A.  Right.

15  Q.  You have a list of the medications?

16  A.  Right.  That's the form I would fill out.  I don't know who

17  filled that one out.

18  Q.  What would be the purpose of this?

19  A.  That is just information I need to start the services.

20  Q.  This says office copy on it, so does that mean --

21  A.  Obviously, that was office copy because it was in evidence.

22  Q.  So when you see something that says office copy, is this

23  something that somebody made a photocopy of, or does the client

24  sign two copies of this and keeps one for themselves?

25  A.  I don't know if the nurse had the client sign their copy,

1    but the client has a copy themselves, and we have a copy.

2    Q.  I notice this one is signed by Annie Smith?

3    A.  Yes.

4    Q.  Undated.  Is that unusual?

5    A.  Yeah and Tammy said something about that.  She told me to

6    tell Ms. Annie to make sure she started dating her admissions.

7    I remember that specifically.

8    Q.  And so it looks like we have another copy of the same thing.

9    Is there a reason why Ricky Kilgore would have two admission

10   packets?

11   A.  He was with us for a few years, so it was probably on his

12   re-validation.  Because for the most part, services were

13   approved for a year.  It was maybe six months, and that was

14   rare.  It would be approved quarterly basically.  It depends on

15   what the doctor agreed according to the plan of care.  I

16   remember that.

17   Q.  I'm showing you page 17, which is the authorization that you

18   and disclosure of health information.  This essentially allows

19   you to get information from their physicians?

20   A.  Right.

21   Q.  Including HIPAA?

22   A.  The HIPAA.  That's all included with the HIPAA agreement,

23   yeah.

24   Q.  Again, another version of the grievance and concern?

25   A.  Yeah.

1    Q.   So would they get a copy every time there was a

2    re-evaluation?

3    A.   I don't think we gave them a copy.  I didn't give them a

4    copy at the re-val, no, unless they requested it obviously.

5    Q.   What do we have here?  The physician order?

6    A.   Physician order, yeah.

7    Q.   And that just says that you can provide the personal care

8    for the person?

9    A.   Yep, that's what Tammy would send off initially, and they

10   would fax that back to the office with the progress notes.  Yeah

11   so yeah, those are the different plan of cares you going past

12   now.

13   Q.   So this is what a plan of care looks like?

14   A.   Correct.

15   Q.   It indicates the medicator number on them, start date.

16   A.   Yes.

17   Q.   Provider number?

18   A.   Yeah.

19   Q.   Some of the issues we have hip pain, shoulder injuries, and

20   some boxes checked?

21   A.   Correct.

22   Q.   This tells you what sort of things should be done for the

23   client?

24   A.   Well, I never --  I never filled out one or never so yeah,

25   basically, yeah.

26

1  Q.  And then how would this plan of care translate to a

2  timesheet?  Now again, there's been testimony that there were

3  sample timesheets filled out with the services that a client was

4  supposed to receive and the number of days the client was

5  supposed to receive those services?

6  A.  Uh-huh.

7  Q.  How does the plan of care turn into a sample timesheet?

8  A.  I don't know.  I never created timesheets.  That was Tammy

9  job.  I don't know -- I didn't know how to do that.

10 Q.  So she would somehow take a plan of care and then give you a

11 sample timesheet for each client?

12 A.  For each client, yeah.

13 Q.  And that would go into their folder?

14 A.  Well no, I would keep the sample timesheets on my desk

15 because I had to correct or check timesheets.

16 Q.  So you would use that as a template when you were checking

17 timesheets that had been turned in by caregivers?

18 A.  Correct.

19 Q.  Would you provide a copy of the sample timesheet to each

20 caregiver?

21 A.  Every caregiver.

22 Q.  And these are -- have checked boxes for healthcare providers

23 to fill out?

24 A.  Well, yeah, for the PCW, personal care worker, yeah.

25 Q.  And they are supposed to indicate that the service was done

27

1   on a particular day?

2   A.   Correct.

3   Q.   There's been testimony about Medicaid units?

4   A.   Right.

5   Q.   Are you aware whether or not a check is worth one Medicaid

6   unit or less or more?  Is there some relation between Medicaid

7   units and a checked box?

8   A.   No.  I never even --  No.

9   Q.   On the bottom of the timesheet, what do we have in the right

10  corner?

11  A.   Uh-huh.  What do we have in the right corner?

12  Q.   Yes.

13  A.   I'm sorry, I didn't hear you, Brian.  We have the employee

14  signature and the client signature.

15  Q.   Okay.  Do you know who's in the employee signature on this

16  timesheet?

17  A.   That should be Cateina Kinner.  If this is Ricky -- If it is

18  Ricky Kilgore timesheet, that was his caregiver, his daughter.

19  Q.   And then she'd fill in the times and dates that work was

20  done and the amount of work?

21  A.   Correct.

22  Q.   Did the sample timesheets have those filled out in other

23  words to tell people when the work should be accomplished?

24  A.   No, no, no.  Well, yeah.  Well, so the times and days and

25  stuff like that Tammy would just fill that in for an example,

1    but we would go according to whatever schedule the caregiver

2    could work and whatever schedule the client wanted.

3    Q.  And the personal care worker would put in the total number

4    of hours they worked each day?

5    A.  Correct.

6    Q.  And they would put the total amount of mileage that they

7    drove?

8    A.  Correct.

9    Q.  You mentioned before that you had something to do with the

10   mileage, determining the amount of mileage that should go into a

11   timesheet.  How did you determine that?

12   A.  I would just put the caregiver's address in MapQuest and put

13   the client's address in MapQuest, and MapQuest would shoot me

14   back that information, and I would print it out.

15   Q.  You would give that to the personal care worker?

16   A.  No, I would just stick that in the --  I think maybe the

17   personal care worker's file and the client's file.  I know the

18   client's file for sure.

19   Q.  So would the personal care worker put the mileage down on

20   their form?

21   A.  No, Tammy --  I would send Tammy the mileage, and she would

22   put that on the timesheet.

23   Q.  On the sample timesheet?

24   A.  The sample timesheet, yeah.

25   Q.  So the sample timesheet will have checked boxes on the

29

1    activities that should be completed?

2    A.  Uh-huh.

3    Q.  It will have an example of times that the work could be

4    completed?

5    A.  Right.

6    Q.  The total amount of hours in a day that a person can work?

7    A.  Right.

8    Q.  And the mileage from their home to the client's house?

9    A.  Right.

10   Q.  Is that there and back or just one way?

11   A.  Obviously, it's there and back so -- I would think.  I just

12   wrote it down.  Whatever the MapQuest shot back.  I never added

13   it up.

14   Q.  And you said in this case this is Ricky's daughter?

15   A.  Yes.

16   Q.  You said, I believe, that most caregivers were family

17   members of some sort?

18   A.  Family members or friends or what not.

19   Q.  You've heard testimony about the referrals from a Touch of

20   Love and Phil Daniels?

21   A.  Correct.

22   Q.  Was that the case with those clients?

23   A.  Well, no.  Phil -- Every client that he brought over --

24   referred to Wellness Personal Care should of had a caregiver

25   with them, so I really didn't know if they were related or if

1  they were close to them.  I just didn't know how he structured

2  his employee situation.

3  Q.  Turning back to the total hours.  You have five and-a-half

4  hours on this timesheet?

5  A.  Correct.

6  Q.  Do you know how that number was determined?

7  A.  So however -- So I guess that would be the units whatever

8  was allowed -- whatever was allowed through the state.

9  Q.  That's what I'm asking.  Do you know how the units were

10  determined?

11  A.  Well, I guess whatever Tammy put in the portal.  So

12  basically when she submit the information, the PA for services,

13  whatever the plan of care the PCST shot back, I guess she would

14  determine it from that.  And so whatever was on the information,

15  the plan of care when she submitted to the DHS, the DHS would

16  either approve, disapprove or probably cut the units down.

17       The DHS had the final say so.  In my opinion, you

18  really could not just say, hey, we want this many hours and they

19  approve it.  The DHS had what would be called a supervisory

20  nurse cause I read those PA stipulations.  Some time they would

21  send back whether they needed more progress notes or whatever,

22  and sometimes Tammy would say they not approved for the hours

23  that we requested, so they approve for say --  So basically if

24  we request five hours, sometimes they would send back, and they

25  would approve two and-a-half hours because they didn't feel that

1    the client needed, you know, whatever we said.

2    Q.  So at some point, Tammy would come up with an estimate?

3    A.  Correct.

4    Q.  Provide that to DHS?

5    A.  Well, she would put it in a PCST first.

6    Q.  That would spit out a number?

7    A.  Right.

8    Q.  That would go to DHS?

9    A.  Correct.

10   Q.  And DHS would either approve it, deny it, or modify it?

11   A.  Correct.

12   Q.  And once you got a number back, that's the number that she

13   would put in the sample timesheet?

14   A.  Correct.

15   Q.  And then you would send her the mileage, and she would put

16   that in the sample timesheet?

17   A.  Correct.

18   Q.  And is it your --  Is it your understanding that the checked

19   boxes on a timesheet need to be completed everyday?

20   A.  Correct.

21   Q.  And what's your understanding regarding the time in and time

22   outs?

23   A.  Well, that's the time that they should have been working and

24   the time that they should have got off.

25   Q.  And what about the total hours?

1   A.  That should be how many hours they worked in a day.

2   Q.  So you're saying that's what it should take to complete the

3   task assigned?

4   A.  Yeah.  According to the timesheet, yep.

5   Q.  And in turn, that's what you would submit when you submitted

6   the timesheets for Tammy?

7   A.  Well, I wouldn't submit the timesheets to Tammy.  I would

8   just keep them in the office.

9   Q.  Then, how would Tammy know whether or not the work had been

10  completed that week?

11  A.  When we do payroll.

12  Q.  So walk me through the process.  You get on the phone, Zoom,

13  how do you talk to her?

14  A.  We did it over the phone.

15  Q.  And you'd have your list of clients?

16  A.  Yeah, we had our list of clients.

17  Q.  You'd go through the timesheets over the phone?

18  A.  Yeah --  Well, so with the clients outside of Phil, they

19  would make sure they turn in their timesheets every week.  So

20  it's kind of easier to go through their timesheets.  Since he

21  was turning --

22  Q.  Stop there.  When you're looking through the timesheets,

23  what sorts of things are you looking for?

24  A.  Um, just looking to see if every day was marked off for

25  work.

1   Q.   And what would you do if a day was not marked off for work?

2   A.   We wouldn't bill for that.  We wouldn't pay the client --

3   the personal care worker for that day, sorry.

4   Q.   And then what else did you look for on the timesheet?

5   A.   I really didn't check for other mistakes like that when we

6   were doing --  when we were doing payroll because we were just

7   trying to get through a payroll.  So I would see the -- set the

8   timesheet aside.  And before I put it in the client's file, I

9   would check them a little bit more thoroughly.

10  Q.   How would you convey to Tammy that the work had been

11  completed or not completed or we have a timesheet or we don't?

12  A.   Just --  For the most part when we did payroll, but I just

13  kind of looked over all the timesheets and made sure the

14  timesheets were in and correct on my own.  I didn't bog her down

15  with that.  That was mostly my job.

16  Q.   I guess what I'm getting at, did she even ask you if they

17  were done when entering payroll or say, for example, did

18  Mr. Kilgore get a timesheet today?

19  A.   I would let her know when I did payroll if they didn't have

20  a timesheet in.

21  Q.   So she would know to enter billing information based on you

22  letting her know that you had the information?

23  A.   Yeah because from what she told me, she would bill after the

24  prior week of when we did payroll.  So basically if the

25  timesheet is at the office, that is when she bill.  She'd bill

1    basically the week after the timesheets were turned in.  She

2    didn't bill before the timesheets.  She billed a week after.

3    That's the best way I can explain that.

4    Q.  You started to talk about how things were different with

5    Phil's clients.  Can you explain what was different with Phil?

6    A.  Well, in what aspect?

7    Q.  You said with timesheets.  You said timesheets with your

8    clients, they'd come in one at a time, and you really go did

9    through.  What was different about Phil's clients?

10   A.  So I instructed all my employees and Phil as well whenever

11   he wanted to drop off timesheets -- Because I didn't have to be

12   in the office, you could just leave them in the mailbox.

13        But with Phil's clients since he had control of his

14   employees and clients, they would just drop their timesheets off

15   in bulk.  So it would be -- Every client he had control over,

16   they would just drop off a bulk of timesheets.

17   Q.  And what did that do for your workload?

18   A.  I mean when we did payroll because we paid Phil for -- to

19   pay his employees, as long as the bulk of timesheets was in we

20   just -- because she had to, like, I don't know if we made a

21   list.  She just did the amount we had to give him for payroll,

22   so we wouldn't go through all the timesheets.

23        As long as he had the timesheets in, we would just

24   give him whatever he had to pay his employees.  But for the most

25   part, I would just let timesheets sit on the side and stack up

1    and stack up and stack up until I got time.  Sometimes I would

2    be, like, today I am going to go in the office and go through

3    timesheets and file them in the folders.

4            It was just too much work.  I wouldn't be able to get

5    on the phone with the doctors.  I just had a lot of paperwork to

6    do in the office.  There is a lot of paperwork.

7    Q.  Then, after you conveyed to Tammy that somebody submitted

8    their timesheets or things were good to go, what did she do with

9    that information?

10   A.  Well, we only talked about that information when we did

11   payroll so --

12   Q.  What would she do with it at that time to your knowledge?

13   Do you know if she does anything?

14   A.  I don't know what day she billed on, so I'm quite sure --

15   Q.  She would use that information to bill?

16   A.  Yeah.  She didn't see the physical sign.  She would just

17   rely on me to say the timesheets were in.

18   Q.  Do you know how she goes about submitting claims to

19   Medicaid?

20   A.  I think --  I know it's through DHS, but I don't know how to

21   bill.

22   Q.  So you don't know what information she inputs into the

23   system?

24   A.  No, no.

25   Q.  But she does?

1    A.  Yeah.

2    Q.  All right.  What happens after that?

3    A.  After she --  Well, I knew that she billed every week, so

4    she billed every week.

5    Q.  After she submits a bill or a claim to Medicaid, what

6    happens?

7    A.  Um, I think we get paid a week later or every Thursday, I

8    forgot.  The pay would come through.

9    Q.  So Medicaid would pay Wellness Personal Care?

10   A.  Correct.

11   Q.  And then what would you do with the money that comes in?

12   A.  Well, the company --  We paid employees biweekly and the

13   company got paid biweekly.

14   Q.  So you would pay your employers after the money came in?

15   A.  Correct.

16   Q.  And those are the caregivers?

17   A.  Correct.

18   Q.  How would you pay the caregivers?

19   A.  Well, we had a Paychecks account.  So some of them wanted

20   through the direct deposit because they wanted the W-2's, or

21   they would let me know if they wanted to be exempt, and I could

22   put that in the Paychecks portal.  But a lot of them wanted

23   written checks so --

24   Q.  Why did they want written checks?

25   A.  Because they wanted to go cash them.  They didn't have bank

1  accounts or we kind of dealt -- The demographic of employee

2  cause we was only paying $10 to $11 dollars an hour, so a lot of

3  them didn't have bank accounts, never had bank accounts or

4  didn't know how to open up a bank account.

5  Q.  Does Paychecks issue written checks?

6  A.  Correct.  They do direct deposit, and they also mail checks

7  if I request in the portal if I remember.

8  Q.  So if a care worker wanted a check, they either had to wait

9  for Paychecks to put it in the mail to them, or you could write

10  them one on the spot?

11  A.  No, they did direct deposit if they had an account.  So I

12  would put direct deposit info in the portal or if I request that

13  they mail the check, it would come to the office, and they would

14  have to come pick it up or I would write them a check.

15  Q.  That's my question.  Why would you write them a check if

16  Paychecks can just send them a check?

17  A.  Well, when we first started doing it, I didn't know that you

18  could, you know, just put all them in there, and we just

19  simplified it and write them a check.

20  Q.  If Paychecks were to send them a check, they don't know that

21  information until you --

22  A.  Until I put it in a portal.

23  Q.  And then, they're going to mail it?

24  A.  Yeah.

25  Q.  And that's going to take some time?

1    A.  Correct.

2    Q.  So if you give them a check the day the money comes in, they

3    can have that money the same day?

4    A.  Correct.

5    Q.  And not have to wait?

6    A.  Correct, yeah.  But if I -- Not to add, I think they mailed

7    the checks pretty fast, but they wouldn't come on pay day.

8    Q.  They wouldn't come the same day?

9    A.  No, no, no.

10   Q.  Some of your workers might need that?

11   A.  They wanted they check right away.

12   Q.  Let's talk about the 60-day visits.  What is a 60-day nurse

13   visit?

14   A.  We called it a sup visit, supervisory visit.

15   Q.  What is the purpose of that?

16   A.  It's just a 60-day evaluation or the client, basically

17   simplified.

18   Q.  And what sort of information is the supervisor supposed to

19   look for?

20   A.  You know what, I never read the sup visit paper.  I just

21   printed it out and gave it to the nurse when they needed it.  I

22   would assume whatever they had to check with the client or

23   whatever.

24   Q.  So you don't really know what they're checking up on?

25   A.  Not really.  I mean obviously, common sense would tell you

1  they are checking on the health, you know, make sure everything

2  is all right with the client.

3  Q.  Would you ever check up on your clients?

4  A.  Sometime if I had the information.  When we first started

5  the business and structured everything, Tammy said that we

6  should do wellness checks, weekly calls.  And so my son when we

7  first opened, he would do that, my 25-year old.  And so when,

8  you know, he stopped working for me, I tried to keep up with it

9  at the beginning, but I mean work got overwhelming.  And not

10  only that, a lot of clients, they really wouldn't keep a good

11  cell phone or have the same cell phone number, so it would be

12  hard to get in contact with them, so it was too much of a job so

13  it was something I didn't continue to implement.  We stopped

14  that right fast kind of.  But some clients, I checked on if I

15  had more of a relationship with them somewhat.

16  Q.  Let's talk about as the business is beginning before you met

17  Dr. Phil, how did you get your clients?

18  A.  Mostly through word of mouth, and we did a Red Book add.

19  Q.  Let's first talk about word of mouth.  What kind of word

20  mouth?

21  A.  Well, one of the things I did, I passed out flyers, ah man,

22  word of mouth, did the Red Book add, family and friends.  Like

23  different festivals, we would set up a booth, get clients like

24  that, different things like that.  Like Garfield Days, whatever

25  that festival is they have, Juneteenth.

1    Q.  Was that a successful marketing strategy?

2    A.  Most definitely.

3    Q.  How many clients do you think you had in the beginning, how

4    did it start?

5    A.  Before I met Phil?

6    Q.  Before you met Phil.

7    A.  Before I met Phil, we probably had 30, 40 clients.

8    Q.  That was through the various sources?

9    A.  Correct.

10          MR. FAHL:  For the witness and counsel only, I'm going

11   to show you Exhibit 1041.

12          THE COURT:  1041 for the witness only.

13   Q.  Do you recognize this document?

14   A.  Correct.

15   Q.  What is this?

16   A.  That's an add that we would put in the Red Book.

17   Q.  And who created the add?

18   A.  I don't remember who I had create that.  I had somebody

19   create that, but we did basically.

20   Q.  And then once the add was created, you submitted it to the

21   Red Book?

22   A.  Correct.

23   Q.  Does this fairly and accurately represent an advertisement

24   from Wellness Personal Care?

25   A.  Correct.

1       MR. FAHL:  Move to admit.

2       THE COURT:  Any objection?

3       MS. LOUNSBERRY:  No, Your Honor.

4       THE COURT:  Without objection, I will admit 1041.  You

5  may publish.

6  Q.  So for the jury, this is a copy of the advertisement that

7  you had in the Red Book, Mr. Monroe?

8  A.  Yeah, correct.  I'm sorry.

9  Q.  You were offering -- You were now accepting new clients?

10  A.  It's just an advertisement for clients.

11  Q.  You note that you have negotiable pay rates for caregivers?

12  A.  Correct.

13  Q.  You're hiring registered nurses?

14  A.  Yeah, now hiring registered nurses.  I'm tripping.

15  Q.  You offered a $250 referral fee?

16  A.  Correct.

17  Q.  You said that was a successful campaign?

18  A.  Correct.

19  Q.  And then you continued that business in that way of getting

20  clients until you met Phillip Daniels, correct?

21  A.  Well, we continued that even after I met Phil.

22  Q.  But up until you met Phil, that was the only way that you

23  received clients was --

24  A.  That was one of the ways, yeah.

25  Q.  Red Book or your other word --

1    A.   Word of mouth, yeah.

2    Q.   So the things that you mentioned were the ways --  Strike

3    that.  Were there any other ways that you solicited clients

4    other than the Red Book or the things you discussed earlier?

5    A.   Nah.

6    Q.   Then eventually, you were introduced to Phil Daniels?

7    A.   Correct.

8    Q.   About how long after your business started was that?

9    A.   We was open a good two years, maybe a strong year because we

10   started -- We formed in '17.  So year, year and-a-half.

11   Q.   How did you come to meet Mr. Daniels?

12   A.   Pastor Ansen, my buddy.

13   Q.   Tell me about how that occurred?

14   A.   You know, I went to his brother church, and me and Henton,

15   we didn't real know each other long.  He knew I had a personal

16   care agency, and he let me know he knew somebody that could

17   probably refer me more clients.

18   Q.   And you thought that might be a good idea?

19   A.   Yeah.  I mean, who starts a business not to grow.

20   Q.   So you met with Mr. Daniels?

21   A.   Yeah, we met eventually.

22   Q.   And what did you -- What sorts of topics did you cover?

23   A.   Well, we went out to eat.  Did we go out to eat immediately?

24   I don't know if we talked on the phone first, but we talked

25   about -- He let me know he could get clients.  He talked a lot,

1    and he was funny to me.  He was with Joelle, like, she said.

2    She was mostly quiet, and he just talked a lot.  He let me know

3    he could get me clients so on and so forth.

4    Q.  How could he get you clients?

5    A.  He didn't tell me exactly how I don't think.

6    Q.  Do you know he had his own supportive care agency at that

7    point?

8    A.  I don't think he told me that.  I'm not sure, but he told me

9    that he helped other agencies get clients.

10   Q.  And in that first meeting, did you come to a resolution

11   whether you were going to get into business with Mr. Daniels or

12   not?

13   A.  Probably.  I think it was that first meeting, yeah.

14   Q.  And what was the overall understanding?

15   A.  You know what, I told him I let him know because I had to

16   ask Tammy first because she wasn't at the meeting with me.  So I

17   know I didn't make a decision unless I talked to her first.

18   Q.  Do you know what the general terms were going to be after

19   that meeting, or were they not discussed at that first meeting?

20   A.  Well, did he tell me?  No, I think he probably told me,

21   like, the terms after I let him know that we was going to move

22   forward.  I probably told him --  He probably was discussing it

23   to me then, and I was probably, like, yeah that sound good.  I

24   don't want to make a decision, you know, without my partner.

25   Q.  Was your understanding that you would pay him a certain

1   amount of money per hour worked for referred clients?

2   A.  Well, he said -- I think he told me, like, he had three

3   different ways.  He told me, you know, I can refer you clients.

4   I can refer you a client, and I don't have anything to do with

5   the client or whatever, and you can give me I think he said $500

6   if I am not mistaken.  And he said I can or I can refer a client

7   but I manage the client and I have an employee take care of the

8   client, but I want $2 an hour for a client.

9   Q.  Which of those options were you interested in or both?

10  A.  I think immediately I said listen, you know, I take the $2,

11  you know, if you want to do that because I don't know if he made

12  it sound like he can refer me more clients that way versus the

13  other way.  That just sounded -- $2 an hour sound more

14  intriguing to me.  And my thing, is that legal, you know?

15  Q.  And if he was managing the client, that would take some work

16  off your plate?

17  A.  Correct.

18  Q.  We heard testimony and saw exhibits about some of the checks

19  that you wrote to Mr. Daniels?

20  A.  Correct.

21  Q.  Some were called consultant, consultant fee, and I think one

22  that said referral fee?

23  A.  Correct.

24  Q.  Why did you refer to it as that?

25  A.  Well, I don't --  When I first started writing checks, I

1   didn't fill the memo box out.  So later on, I caught myself

2   trying to complete everything and do things right, so I probably

3   wrote referral fee and let Tammy know I'm filling out the whole

4   check or whatever.  I think she told me on that part you put

5   consultant fee for the $2 an hour.  And then for the payroll,

6   you just put the payroll and/or consultant.

7           One of the checks if it had a slash consultant fee and

8   payroll, I probably owed him some money.  That money probably

9   was in that with the payroll whatever, so I probably -- That's

10  probably why I did it.

11  Q.  So there's two sorts of bags that you're paying from or two?

12  A.  Right.

13  Q.  One, if I am understanding, tell me if I am wrong.  One is

14  for him to pay the wages for his care workers?

15  A.  Correct.

16  Q.  And that's what you generally referred to as payroll?

17  A.  Correct.

18  Q.  The second group is the $2, and I think it was later raised

19  to three or $4 an hour?

20  A.  $3.

21  Q.  But that is what Mr. Daniels got for managing the care

22  workers and the care of that client?

23  A.  Correct.

24  Q.  And you were fine not being in the day-to-day care of those

25  clients?

1    A.    Yeah.  I mean, yeah I was fine with it because, you know, I

2    just trusted that he would do everything that he was supposed to

3    do.  I can only do so much.

4    Q.    When did you find out that Phil helped his clients by giving

5    them rental assistance?

6    A.    Medical assistance?

7    Q.    Rental.

8    A.    I think they told me that.  That's how they was doing with

9    their supportive care agency.  I thought, I'm like, how are

10   you --

11   Q.    At some point, you learned that Phil had a supportive care

12   agency?

13   A.    He told me his father did.  He told me Pops was his father.

14   Q.    Pops is Roy Henton?

15   A.    Correct.

16   Q.    And he told you Roy Henton had a supportive care agency?

17   A.    Correct.

18   Q.    The name of that supportive care agency is a Touch of Love?

19   A.    Correct.

20   Q.    Phil also had his own supportive care agency?

21   A.    Well, I don't think he let me know that until I told him --

22   asked him who did you want me to write the check to, his pay.

23   Q.    Because -- Was that because the owner of that is his wife,

24   Betty Daniels?

25   A.    I found that out later.

1  Q.  At the time you met him, you believe Joelle was his wife?

2  A.  He told me he had three wives.  I thought one was good

3  enough.

4  Q.  Did he tell you how what he was using to give that rental

5  assistance, like, how those funds were coming from?

6  A.  You know what, I'm like --  We were able to give supportive

7  care, but the supportive care was basically, like, the personal

8  care I thought.  But we didn't do much supportive care with a

9  lot of clients because IRIS paid their PCWs more than we paid,

10  substantially more.  I think they paid their PCWs, like, $15 or

11  $16, and we couldn't afford to pay PCWs that much.

12          So if we suggested supportive care, an IRIS person

13  would come in and would have to talk to the caregiver.  And

14  sometimes the client would leave because the caregiver would

15  tell them we going to IRIS because they pay more.  But sometimes

16  because we was making enough money, I would tell the clients

17  that, you know, you can --  I think it would be better if you go

18  to IRIS because you can get paid more money because they do a

19  more strict background check than we did at Wellness.

20          So when he told me that he was doing -- they had

21  supportive company, they were providing rent, I thought that was

22  pretty strange, but I know it's a lot of different type of

23  medical assistance companies where they have to provide living

24  and so on and so forth for clients, so I didn't know.

25  Q.  Anyway after that first meeting, you said that you wanted to

1   confer with Tammy?

2   A.   Correct.

3   Q.   Did you have that conversation?

4   A.   Every -- Yeah everything that I did with the business, I ran

5   it past Tammy first.

6   Q.   And did Tammy have any objections about going into this

7   agreement with Phil?

8   A.   No, she thought it was pretty good.  She actually flew in

9   town to meet him.

10  Q.   You were excited to increase your business?

11  A.   Most definitely.

12  Q.   And so you start the referral business with Phil and a Touch

13  of Love.  Can you explain how the Touch of Love clients came

14  over to Wellness Personal Care?

15  A.   Well, typically the way it works if a client is receiving

16  supportive care, there's a possibility that they are eligible

17  for personal care and vis verse.

18  Q.   Right.  And so how did the clients get on your company?

19  Would you do the same intake process that you did with outside

20  clients, or was there something else that happened?

21  A.   Well, I gave him a stack of the referral sheets that I

22  filled out when I met clients.  And so he would just take and

23  put the information on there and just drop it off at the office.

24  Q.   Right.  And so once Phil gave you the names and

25  identification for the potential clients --

1    A.   Uh-huh.

2    Q.   -- you would then go through your same process and contact

3    those clients and get them signed up?

4    A.   No, I wouldn't contact the client.  He strictly did that.  I

5    would just put their information in the portal to make sure they

6    got the right insurance so on and so forth.

7    Q.   How would the nurse know who to go see?

8    A.   He wanted to make sure that he was at the client house when

9    she did the admission or somebody that he assigned to be with,

10   so I gave -- Whatever number he gave me if it was Joelle or if

11   it was his brother, I would give that to my nurse and tell her

12   to contact whoever he wanted it to be because my nurse didn't

13   initially get -- We didn't have the client's phone number, so I

14   couldn't give her the client phone number.  I just would have

15   her call him or whoever he would want to be at the client's

16   house before my nurse went.

17   Q.   And so then the nurse would get the information from Phil or

18   one of his helpers?

19   A.   Yeah.

20   Q.   And then the nurse would go to the client's house?

21   A.   Uh-huh.

22   Q.   And your understanding is that she would perform the

23   evaluation just like she would on any of your clients?

24   A.   Correct.

25   Q.   Then, after she completed the evaluation, would she bring

1  that information back in to you, or would she give it to Phil?

2  A.  No, she would bring it back to the office and whatever, I

3  guess, she was supposedly the extra folder with the client.

4  Q.  So the client's file was supposed to stay with the client?

5  A.  Correct.

6  Q.  That's the file that had your contact information?

7  A.  Correct.

8  Q.  Do you know if those files were actually left with the

9  clients?

10  A.  I mean nobody checked in or let me know that.  I assume, you

11  know, that it was done the way it was supposed to be done.

12  Q.  And then once that information came back in to you, you

13  would go through the same process of getting the client --

14  A.  Approved.

15  Q.  And then, what would happen after a client was approved and

16  given a number of hours and you get to the point where there's a

17  plan of care and Tammy creates the sample timesheet, what

18  happens next with the Phil clients?

19  A.  I would have him come and get the sample sheet, but he had

20  --  He would have --  With every client he referred to me, it

21  would have to be an employee so he would bring the employee to

22  the office and fill out the information.  Every employee had to

23  come to the office.

24  Q.  And then so how many employees was that?

25  A.  I don't remember.  For however many clients that he referred

1    to me, they had to have an employee.

2    Q.  Do they have to have a separate employee, or can the same

3    employee be the same worker?

4    A.  Sometimes the care worker would be the care worker for more

5    than one client.

6    Q.  Did any of Phil's clients ever call you to complain?

7    A.  Nah, no.

8    Q.  Did any of your clients call you to complain?

9    A.  Yeah.  You know what, Joshua Pinnock did when he started

10   with Phil with the supportive care.  My clients complained.

11   They called if they had a problem.

12   Q.  And so you did refer some clients from your agency to a

13   Touch of Love; is that correct?

14   A.  Yeah for supportive cares.

15   Q.  These are clients of yours who also had supportive care

16   needs?

17   A.  Yes.

18   Q.  And so you -- I will do you a solid, and I'll refer you some

19   clients back?

20   A.  Kind of, yeah.

21   Q.  Do you have the same sort of agreement where you would get a

22   piece of the clients you referred to him?

23   A.  I was going to try.  Ricky Kilgore I referred over to him,

24   but they never --  They didn't pay the way I paid them, so I

25   just basically just left it alone.  I didn't move forward with

1    it.  I had too much going on.

2    Q.  You heard clients and Phil testify that he coached them to

3    lie during nurse's evaluations to qualify for more services?

4    A.  Correct.

5    Q.  Were you aware that this was being done?

6    A.  You know what, I think after -- before we ended the

7    relationship, I probably got a call if I can remember.  But no,

8    no I wouldn't play those type of games.

9    Q.  And did you ever do this?

10   A.  No, I made enough money.

11   Q.  Phil started referring a lot of clients?

12   A.  Correct.

13   Q.  And timesheets quickly became a problem for Phil's clients,

14   correct?

15   A.  It was bulk.

16   Q.  Can you explain what the problem was?

17   A.  As far as -- What you mean the problem as far as with me

18   with his timesheets?

19   Q.  Correct.

20   A.  So when I would check them, when I would go through the

21   stack when I get a chance to go through the stack, sometimes it

22   would be a lot of missing timesheets.  And I don't know maybe --

23   probably was a signature not signed, stuff like that, just

24   regular.

25   Q.  You heard testimony about, you know, forged signatures and

1  different looking signatures?

2  A.  Correct.

3  Q.  Is the signature something that you looked at when you were

4  reviewing timesheets?

5  A.  No, I wasn't a signature analyst.  I didn't analyze the

6  timesheets like that.

7  Q.  Did you even look at the signatures?

8  A.  I mean, I glanced over them.

9  Q.  What were you most concerned about?

10  A.  To make sure that it was signed and because, you know, I

11  just really didn't pay too much -- I sign my signature sloppy

12  sometimes.  I didn't look to see, you know --

13  Q.  But you were having this backlog of timesheets, correct?

14  A.  All the time.

15  Q.  And so it was hard for you to determine whether or not

16  claims should be submitted to Medicare based on this backlog?

17  A.  Well, no.  Tammy, she did the billing every week, so she

18  just -- If we pay --  We wrote Phil to pay for the employees,

19  she knew the timesheets was in the office because we wouldn't

20  pay until the timesheets was in the office.

21  Q.  So the timesheet had to be in the office?

22  A.  Correct.

23  Q.  To get paid?

24  A.  Correct.

25  Q.  But maybe not reviewed by you?

1   A.   Maybe not reviewed by me.  The timesheets that he turned in

2   because I didn't go to them right away.  As long as the

3   timesheets -- They would drop them off in an envelope or they

4   would drop them off in a stack.  As long as they were there in

5   the office, we'd give them the payroll.

6   Q.   And you didn't have these sorts of problems with the

7   personal care workers that you brought on, the WPCS clients?

8   A.   Sometimes they wouldn't turn in their timesheets on time,

9   and I would hold they check until they turned them in.  We had

10  some problems.  In bulk no, they dropped off they seven

11  timesheets for the week.

12  Q.   So they're doing one at a time.  They were not doing it in

13  bulk?

14  A.   No.

15  Q.   You said you referred some of your clients to Phil?

16  A.   Correct.

17  Q.   And that's because they needed supportive services?

18  A.   Right.

19  Q.   Your aunt, Claudia Virgil, is one of the people you referred

20  to Phil?

21  A.   Correct.

22  Q.   Why was that?

23  A.   Well, I don't think she wanted supportive services, so we

24  didn't --  We didn't refer her for supportive.  We could have

25  did supportive for her herself because for the most part, her

1    granddaughter, one of my cousins, would be her caregiver, and

2    they wouldn't leave the agency to go to IRIS for pay.

3              But my little cousins, they didn't have time to take

4    care of Claudia after a while, so I think I let Phil know.  He

5    said I can get somebody to take care of her.  I said okay, cool.

6    Q.  And it was your understanding she was getting the care?

7    A.  Was she?

8    Q.  Was she getting that supportive care?

9    A.  No, no, she was getting personal care.

10   Q.  She was getting personal care.  And then when you

11   transferred her to Phil, was she just getting personal care?

12   A.  Still just getting personal care.

13   Q.  And do you know if she still received that personal care

14   when she went to Phil?

15   A.  She should have been, yeah.  I mean, we billed for it, and

16   they turned in the timesheet for it.  Yeah, she was getting

17   personal care.

18   Q.  Did she ever tell you that she was not getting personal

19   care?

20   A.  No.

21   Q.  How often would you speak with her?

22   A.  I spoke to Claudia all the time.  It was my auntie.

23   Q.  By all the time, are you talking hourly, daily, weekly,

24   monthly?

25   A.  No, she would just call me, you know, boy, I need some money

56

1  or where you at.  My auntie, she passed away recently.

2  Q.  So she would call you asking for money?

3  A.  Yeah.

4  Q.  Would she -- How often would that happen?

5  A.  Whenever she wanted anything.

6  Q.  And what would you do?

7  A.  Give it to her.

8  Q.  You heard some testimony, I think might have been Joelle,

9  talking about that maybe some conversation where you told her to

10  give Claudia some money?

11  A.  Well, Tammy gave her money every week when we get paid so

12  when employees get paid.  So Tammy just gave her money, so that

13  would come out of Tammy money.  We would let Joelle drop it off,

14  so I wouldn't have to drop it off, drop off the money to her.

15  Q.  Going back to your clients now, not Dr. Phil clients.

16  A.  Correct.

17  Q.  We heard some testimony about Nyla Collins?

18  A.  Nyla Collins.

19  Q.  Who was she?

20  A.  She was a client.

21  Q.  Who was her care worker?

22  A.  Her daughter.

23  Q.  Did you ever have problems with her timesheets?

24  A.  I did have a problem with her timesheets one time.  She

25  brought me some timesheets that she copied, that she marked off.

1  She just copied them, but she put her signature instead of

2  marking the X down.  She copied it, so I told her I can't accept

3  this.  You have to write the Xs in the timesheet.  Other than

4  that, no.

5  Q.  And did you get any complaints from Nyla about the personal

6  care?

7  A.  No, it was her daughter.

8  Q.  And you billed her in the normal course?

9  A.  Correct.

10  Q.  Those got submitted to Medicaid?

11  A.  Correct.

12  Q.  Claims came back paid?

13  A.  Correct.

14  Q.  And then you paid her daughter?

15  A.  Correct.

16        MR. FAHL:  Your Honor, if we're taking a lunch break,

17  this might being a good time; otherwise, I have another block of

18  ten or 15 minutes.

19        THE COURT:  No, that's fine.  If you think this is a

20  good stopping point, we can take our lunch break here.  So

21  Members of the Jury, please don't talk to each other or anyone

22  else.  Get out and enjoy the sunshine while we have it.  See you

23  back in an hour.

24        THE CLERK:  All rise.

25        (Jury excused.)

1          THE COURT:  Anything we need to take up before we take

2    our break?

3          MS. LOUNSBERRY:  No, Your Honor.

4          THE COURT:  Mr. Fahl.

5          MR. FAHL:  No.  Thank you, Your Honor.

6          THE COURT:  All right.  See you all back in an hour

7    give or take.

8          THE CLERK:  All rise.

9          (Lunch recess taken.)

10          (Back on the record.)

11          THE COURT:  Okay.  First of all, during the

12    instruction conference this morning, we were talking about the

13    responsibility instruction.  Not that I didn't trust Mr. Fahl,

14    but I did go back and look, and we did not give that instruction

15    in the last fraud case that we had that was sort of a similar

16    circumstance, so I'm not going to give it.

17          I understand Ms. Monfils' point about, you know, the

18    jury -- somebody might say, well, if some person who is alleged

19    to have participated is not convicted, then can Mr. Monroe be

20    convicted?  I think --  I just don't think -- This is not a

21    situation again where we have multiple people charged.  We only

22    have got Mr. Monroe charged, and we got the aiding and abetting

23    instruction and the joint venture instruction, so I'm not going

24    to give responsibility.

25          With regards to Mr. Fahl's Rule 29 motion, I am going

1  to deny that motion. I know I deferred ruling on it. I don't

2  think my ruling is going to be dependent on the remainder of

3  Mr. Monroe's testimony. I think the case that the Government

4  was referring to and Ms. Monfils was making her argument, the

5  Seventh Circuit decision is *United States v. Haddad*,

6  H-a-d-d-a-d, 462 F.3rd 783, a decision from 2006. There are

7  some other decisions that also say the same thing. But that

8  decision says that -- This is a case where Mr. Haddad argued the

9  Government didn't sufficiently prove that at least $10,000 of

10  the checks involved were illegitimate funds. And what the

11  Government had proved was a co-mingling of illegitimate funds.

12      The Seventh Circuit said, we have reason that "we

13  cannot believe that Congress intended that participants in

14  unlawful activity could prevent their own convictions under the

15  money laundering statute simply by co-mingling funds derived

16  from both specified unlawful activities and other activities."

17  And it was quoting -- This is at pages 791 and 792 quoting

18  *United States v. Baker*, 227 F.3rd 955 at 965 to 966, Seventh

19  Circuit decision from 2000. The Seventh Circuit went on to say,

20  "The Government does not need to trace every dollar of income

21  connected to a specific instance of laundering", which is what

22  Ms. Monfils argued earlier.

23      More specifically with regard to what I think

24  Mr. Fahl's argument more accurately could be described as is a

25  question of variance or constructive amendment. Didn't find or

60

1  my law clerks did not find a Seventh Circuit case directly on

2  point.  However, there is a decision from the Sixth Circuit,

3  *United States v. Ashrafkhan*, A-s-h-r-a-f-k-h-a-n, 821 F. App'x

4  428, a 2020 decision, described a variance as occurring when the

5  charging terms of the indictment are not changed but the

6  evidence at trial proves facts materially different from those

7  alleged in the indictment.  This is at page 440.

8         And the Sixth Circuit specifically stated that

9  conviction based on a variance if there is one is warranted only

10 where a defendant proves, number one, that a variance occurred.

11 And number two, that the variance affected a substantial right."

12        And the Court talked about the circumstance where an

13 indictment demonstrates one conspiracy or one crime, and the

14 defendant ends up being convicted of a completely different

15 crime.  That is not the case here.

16        Mr. Monroe has been charged with a money laundering

17 count.  And the question is whether or not the Government can

18 prove that money laundering count.  It is not as if he were

19 convicted if the jury concludes that there's sufficient evidence

20 to prove beyond a reasonable doubt that he committed money

21 laundering.  It's not as if that would be a different crime than

22 the crime he has been charged.  He has been charged with money

23 laundering.  The issue is the specified activity.

24        And finally in that regard to the fact that Mr. Fahl

25 argued that the indictment mentions wire fraud as being the

1  specified activity, there is a decision from the Second Circuit,

2  388 F. App'x 65 from 2010, *United States v. Shyne*, S-h-y-n-e.

3  And page 70 of that decision, the Second Circuit said proof at

4  trial need not indeed cannot be a precise replica of the charges

5  contained in the indictment."  Quoting another Second Circuit

6  case from 2007 stated, "that the fact that additional facts may

7  be proven against a defendant does not establish a variance."

8          Finally, Ms. Monfils had argued this morning that

9  although it is not charged as wire fraud, healthcare fraud

10  necessarily requires a wire given the way that the Medicaid

11  system and reimbursement system is set up, and so there was

12  wiring that was involved in the healthcare fraud funds that went

13  into that same account as the PRF funds.

14          So for all of these reasons, I am denying the Rule 29

15  motion, and I wanted to give you that decision before we got to

16  closing arguments if we got to closing arguments.  I didn't want

17  you, Mr. Fahl, to be in a position where you didn't know one way

18  or the other what the ruling was.

19          MR. FAHL:  I understand that, Your Honor.  I guess my

20  question is where does that leave me for arguments?  There is

21  1343 in the indictment, right.  That's there, and, you know, am

22  I allowed to argue that they can't meet 1343 for the same

23  reasons?  And the Government can say you don't have to, it just

24  has to be --

25          THE COURT:  Yeah, I think that's right.  You can argue

1    that you believe the evidence does not show that they have

2    proven it.  I think the Government has a right to make all the

3    arguments that it made this morning during the jury instruction

4    conference.

5                MR. FAHL:  Absolutely.

6                THE COURT:  Any questions from the Government on that

7    or anything else that we need to address before we bring the

8    jury back in?

9                MS. MONFILS:  No, Your Honor.

10               THE COURT:  Okay.  All right.  Mr. Monroe, come on

11   back up.  Then, we'll are bring the jury back in.

12               (Jury enters.)

13               THE COURT:  Welcome back, everyone.  Have a seat.

14   Mr. Monroe, you are still under oath.  And Mr. Fahl, go ahead.

15   **CONTINUED DIRECT EXAMINATION BY MR. FAHL:**

16   Q.  Thank you, Your Honor.  Good afternoon, Mr. Monroe.

17   A.  Good afternoon.

18   Q.  You heard Dawn Brody and Michelle Hauck testify that you and

19   Phil came over to their house one night late at night, and that

20   either both of you or just Phil were very high, and then you

21   pulled out a stack of timesheets from your trunk and had

22   Michelle sign them.  Do you recall that testimony?

23   A.  Correct.

24   Q.  Is that true?

25   A.  Well, I remember going by Ms. Brody apartment, but it

1  definitely wasn't at nighttime.  I don't remember the specific

2  reason why we went over there, but it wasn't at nighttime.  I

3  remember speaking with Ms. Brody.  I definitely don't get high.

4  I definitely don't get high or drunk, and I definitely wouldn't

5  drive like that.  And I never knew if Phil got high or drunk.

6  To my understanding, he didn't indulge in those type of

7  activities.

8  Q.  And why would you not think that you were there at night?

9  A.  Because I did not operate -- I didn't work at night.

10  Q.  Now, as time went on, you started having problems with

11  timesheets -- getting timesheets from Phil's workers?

12  A.  Correct.

13  Q.  And we heard some testimony that there were text messages

14  about you requesting timesheets that you had not received but

15  had been billed for quite a deal earlier than your text

16  messages.  Do you recall that?

17  A.  Correct.

18  Q.  Can you explain what might have happened in that situation?

19  A.  Well, so basically for all Phil clients, timesheets would

20  just being dropped off in bulk according to all his clients.

21  Maybe once, maybe one PCW or two.  I think it was Love and I

22  know Hauck.  And they was boyfriend/girlfriend at the time.  He

23  allowed them to drop off they timesheet, maybe one more

24  employee.  I can't remember his name.  But for the most part,

25  they dropped off they timesheets in bulk for all his employees.

64

1  Q.  How would that affect your -- Tammy submitting claims for

2  timesheets that weren't present and weren't even requested until

3  weeks or even a month later?

4  A.  So as long as he dropped over the folder or the bulk of

5  timesheets, the timesheets were in.  I didn't specifically go

6  through each timesheet and check it because there was so many

7  because it would be, like, however many clients that he had with

8  my agency, it would be seven times that for that week.

9          And sometimes he probably would have them all dropped

10  off, like, during the paycheck, so we pay biweekly, so it would

11  be two weeks worth of timesheets for each client, seven days a

12  week.

13          So as long as I see that the folder is dropped off and

14  the timesheets are in there, my assumption is everything is

15  filled out right or whatever until I check them until I get a

16  chance to check them.  So as long as the timesheet is in, he

17  dropped his timesheets off.

18  Q.  So eventually you would go through those timesheets?

19  A.  Eventually.

20  Q.  And you might realize that certain timesheets were not

21  submitted?

22  A.  Correct.

23  Q.  And is that why you'd be sending messages to Joelle?

24  A.  Yeah.  So I would just let -- Even the employees that

25  dropped off their timesheets every week, I would go through

1    their timesheets when I'm entering payroll in Paychecks, but I
2    still wouldn't file the timesheets yet.  I would sit them on the
3    side in a pile because I would have to go through each client
4    folder, go through each timesheet, punch holes in them.  So it
5    was just a lot.  So I would pick days where I would just go to
6    the office just to file timesheets.  As long as I kind of knew
7    they was there, I would let them pile up and pile up.  Or if I
8    had somebody working for me like my step daughter or my daughter
9    or my son, that would be one of their job descriptions because
10   it was too tedious for me to be on the phone, taking care of all
11   the other stuff and, you know, filing timesheets.
12   Q.  But the bulk filing or bulk submitting of timesheets to you
13   became a problem?
14   A.  Well, yeah, most definitely.  If I'm in the office by
15   myself.  If I was by myself, yeah.
16   Q.  Did you attempt to confront Phil about this?
17   A.  Yeah, yeah, yeah.  So, like, when I couldn't --  So if I
18   couldn't get in touch with him, he would be out of town
19   whatever, he would tell me just to get in touch with Joelle or
20   get in touch with Leroy, and they would take care of it.
21          You know, just in business generally, I couldn't get
22   in touch with him all the time.  He claimed he was in California
23   helping people with agencies.  He was in Minnesota helping
24   people with agencies and so on and so forth, but I just could
25   never get in touch with him because I didn't do this business

1    agreement with Joelle or Leroy.  I did this with you, so I want

2    to make sure everything is done right.  It just became a

3    problem.

4    Q.  Is that why you terminated your relationship with Phil?

5    A.  Correct.

6    Q.  And did you later learn that Phil was doing something else

7    in Minnesota and California?

8    A.  Yeah, when I got arrested.

9    Q.  What was he doing?

10   A.  He was El Chapo.  He was selling all kind of drugs.

11          MS. LOUNSBERRY:  Objection, hearsay.

12          THE COURT:  Sustained.

13          MS. LOUNSBERRY:  403.

14          THE WITNESS:  He was selling drugs.

15          THE COURT:  I sustained the objection.  You are not

16   allowed to answer.

17          THE WITNESS:  I am sorry, Your Honor.

18   Q.  I'm going to turn now to your relationship with Lee Ellis.

19   A.  Yes, sir.

20   Q.  How did you come to learn about Lee Ellis?

21   A.  My cousin, Tammy, referred him to me.

22   Q.  And for what purpose?

23   A.  To file taxes.

24   Q.  Did you eventually get ahold of Mr. Ellis?

25   A.  Yes.

1   Q.  Did you meet with him?

2   A.  Yes.

3   Q.  Do you recall when that was approximately?

4   A.  What year was that?  I want to say maybe 2020.

5   Q.  And can you describe your meeting with him?

6   A.  I don't remember the first day we met.  I don't remember --

7   I know we spoke over the phone.  I don't know if I went to his

8   office or he came to my office.  I can't remember exactly.

9   Q.  That was for the purpose of doing your business taxes?

10  A.  Correct.

11  Q.  And is that what he did first?  Did you have --  Did he

12  complete tax returns for you?

13  A.  Correct.

14  Q.  At some point, did he start talking about doing just general

15  business accounting for you?

16  A.  Yeah, when he noticed that I was --  I think when my partner

17  was taking out a lot of money or he was saying where is all this

18  money at?  I said, that is when I had the other BMO Harris --

19  No, no, no, that's not it.  Anyway, he just --  He just noticed

20  that a lot of money wasn't in the records that I brought him to

21  some degree.

22  Q.  He thought that might be a problem for you?

23  A.  Yeah.

24  Q.  He told you maybe we should get this looked at?

25  A.  I think it was the money coming out from Georgia.

1  Q.  You agreed with that?

2  A.  Yes.  So he started helping me with other, you know,

3  business.

4  Q.  So he was trying to help you get your accounts in order?

5  A.  Correct.

6  Q.  Eventually at some point, you decided to apply for that

7  H-R-S-A, HRSA distribution?

8  A.  Right.

9  Q.  You got a copy of that.  The application was emailed to you

10  from HRSA?

11  A.  Correct.

12  Q.  And you looked at it?

13  A.  Right, right.

14  Q.  And you realized you needed some financial information?

15  A.  Yeah.  When I filled out the beginning, me and Tammy kind of

16  would go over it on the phone.  I would talk to her on the phone

17  and let her know the steps on the application.  I didn't really

18  know how to fill out everything.  So whatever I could fill out

19  on the computer on my own I would fill out.  Whatever I needed

20  other information from whatever source, I would get that

21  information.

22  Q.  Okay.  So one of the things you needed to get was something

23  for your total annual revenues; is that correct?

24  A.  Correct.

25  Q.  And for the year 2020?

1   A.  Correct.

2   Q.  How did you find that information?

3   A.  The annual --  The annual revenue information?

4   Q.  Yes.

5   A.  Well, I kind of had 1099s.  I knew how much the company

6   made.  But the financial statements and all that different type

7   of stuff I got from Mr. Ellis.

8   Q.  I'm going to have you refer to Exhibit 41, which has been

9   previously admitted and published.  Are you familiar with this

10  application?

11  A.  Yes.

12  Q.  When it came to you, was this top half of the application

13  pre-filled out?

14  A.  She said yesterday, but I wouldn't remember.

15  Q.  Do you recall filling out your contact person name and

16  information?

17  A.  I mean because this is the second application so, yeah, I

18  had to fill that out.

19  Q.  Then, we get down to lines ten through 12.1.

20  A.  Uh-huh.

21  Q.  Is that where you put your total annual revenues?

22  A.  Right.

23  Q.  For the year 2020?

24  A.  Right.

25  Q.  And that's the same as the revenues from patient care,

1  correct?

2  A.  Correct.

3  Q.  And the documentation is an IRS Form 1120?

4  A.  Right.

5  Q.  Did you have that in your office, or did you have to get it

6  from somewhere?

7  A.  Well, I had --  I gave the 1099s to Mr. Ellis, so I didn't

8  have the gross amount of the company in the office that year,

9  but I got that information from Mr. Ellis.

10 Q.  So did Mr. Ellis send you a copy of the IRS Form 1120?

11 A.  Yeah, he sent me a copy of that.

12 Q.  You requested that from him?

13 A.  Yes.

14 Q.  And this is what he sent in return?

15 A.  Yes.

16 Q.  I will scroll down to -- And so this is the form that he

17 submitted to you?

18 A.  Correct.

19 Q.  And this is the form that you used when filling out this

20 information?

21 A.  Correct.

22 Q.  When we get down to the second page, we have Sections 13 and

23 14.

24 A.  Correct.

25 Q.  That request, operating revenues and operating expenses?

1    A.  Correct.

2    Q.  Did you have that information handy?

3    A.  No.

4    Q.  Did you go to somebody to help you accumulate that

5    information?

6    A.  I went to Mr. Ellis office and got that information.

7    Q.  I'm going to start with Section 13 first.  Did you show

8    Mr. Ellis a copy of this application?

9    A.  Well, when I went to his office, we opened up his computer

10   and opened up my email -- my office email and went on that part

11   of the application.

12   Q.  So that he could see what information was required to fill

13   out the application?

14   A.  Correct.

15   Q.  And then in response to that, did he create any documents

16   for you?

17   A.  The documents that was said that he created yesterday, but I

18   don't remember that specifically, but he had to create them

19   because I didn't create them.

20   Q.  I'm going to have you take a look at those quickly.  They

21   are attached here.  These are the income statements?

22   A.  Yeah.

23   Q.  And Mr. Ellis created these for you?

24   A.  Correct.

25   Q.  For the purpose of submitting this form application?

1    A.   Yeah, probably at that time, yeah.

2    Q.   And then he told you that you needed to put the total

3    revenues in the appropriate boxes above?

4    A.   Well, I kind of understood that just from reading it, but he

5    went over that with me.

6    Q.   I'm going to draw your attention to the quarter three of

7    2020?

8    A.   Uh-huh.

9    Q.   Where you listed $243,909.

10   A.   Uh-huh.

11   Q.   I'm going to look at the accompanying financial statement.

12   What do you notice about the financial statement?

13   A.   It's 100,000 off.

14   Q.   I'm going to have you look at quarter four of 2020.  Do you

15   see the number here?

16   A.   Correct.

17   Q.   What do you notice about the financial statement?

18   A.   Same thing, it's 100,000 off.

19   Q.   Did you enter the numbers in here or did Mr. Ellis?

20   A.   Mr. Ellis gave me the numbers, and I entered them in while

21   we were sitting at the computer.

22   Q.   Do you remember entering numbers that were incorrect?

23   A.   I didn't compare them to anything.  I just put the numbers

24   in that he gave me.

25   Q.   But the quarter three is $100,000 less?

1    A.  Correct.

2    Q.  Did you do that on purpose?

3    A.  No.

4    Q.  Now, I'm turning to Section 14.  Do you see these numbers

5    here?

6    A.  14.5, yeah.

7    Q.  So we'll start with the 14.1.

8    A.  Okay.

9    Q.  That's quarter one of 2019.  Sorry, quarter one of 2019.  I

10   got myself crossed up.  Do you see that $28,000 number in this?

11   A.  No, I don't see.  Closest number I see is 23,000.  I don't

12   see 28 anywhere.

13   Q.  Do you know where you got $28,128 from?

14   A.  Apparently, I got it from Mr. Ellis.

15   Q.  You didn't pull it from the income statement, did you?

16   A.  No.

17   Q.  But Mr. Ellis was helping you create these numbers?

18   A.  Correct.

19   Q.  I will take a look at another one.  Let's look at quarter

20   three of 2020.  What's the number there?

21   A.  573,127.

22   Q.  This is the corresponding income statement.  Do you see that

23   number on here anywhere?

24   A.  No, I don't see 527,000 anywhere, just 227,000.

25   Q.  So do you have any idea sitting here today where these

1  numbers came from in Section 14?

2  A.  Just help from my accountant from Mr. Ellis.

3  Q.  Do you know what the source of those numbers were?  Do you

4  have any idea what he was looking at when you came up with the

5  numbers?

6  A.  I don't remember exactly.  I don't remember.  I couldn't

7  tell you.

8  Q.  You attached the Form 1120, correct?

9  A.  Correct.

10 Q.  And you attached the quarterly income statements?

11 A.  Correct.

12 Q.  Why did you do that?

13 A.  And probably because they requested it and, you know, just

14 had to upload it.  When I put it in, I probably just looked at

15 the quarters and matched it with whatever.  Now I am looking at

16 the computer, I am quite sure I did it that way.

17 Q.  Did you expect that HRSA would review the documentation you

18 provided?

19 A.  Yes.

20 Q.  And if there was something wrong with documentation or was

21 inconsistent, what would you expect to happen?

22 A.  A denial.

23         MR. FAHL:  No further questions.

24         THE COURT:  All right.  Questions from the Government.

25 Ms. Lounsberry.

1          MS. LOUNSBERRY:  Yes, Your Honor.  Thank you.

2   **CROSS EXAMINATION BY MS. LOUNSBERRY:**

3   Q.  Mr. Monroe, you signed a Medicaid Provider Agreement when

4   you started your business, didn't you?

5   A.  Correct.

6   Q.  And that was one of the things that you had to do to become

7   an approved Medicaid provider, right?

8   A.  If I see the document -- Yeah, probably.

9   Q.  Well, let's go to Exhibit 5.  Do you recognize Exhibit 5 as

10  the document that you had to sign in order to become a Medicaid

11  provider?

12  A.  I mean not specifically.  But from years ago, that would be

13  one of the documents.

14  Q.  And if we go to the last page, page 6 of Exhibit 5, that's

15  where you had to electronically sign and submit this agreement

16  on February 5th of 2018, right?

17  A.  Correct.

18  Q.  And when you signed it, you swore that everything that you

19  were attesting to that was in all these paragraphs on the

20  previous five pages was correct, right?

21  A.  Correct.

22  Q.  In fact, if we enlarge this paragraph right above your

23  signature, it reads by signature, the provider or authorized

24  representative swears or affirms under penalty of perjury that

25  the information given in this agreement is true and accurate.

1    By signature, the provider certifies that he or she has read the

2    online handbook and all regulations.  Do you see that?

3    A.  Correct, yeah.

4    Q.  So you were under oath when you typed your signature

5    electronically into this document, right?

6    A.  Well, I wouldn't look at it as being under oath.  It was

7    just filling out the appropriate documents that were sent to me.

8    Did I read over specifically and read that specifically?  I know

9    I didn't do it because that is just not in my character.

10   Q.  So you don't understand swearing to something as being under

11   oath?

12   A.  Well, I didn't --  I didn't read that specifically.  I knew

13   I was filling out the application, and it asked for my

14   signature.  I just put my signature on.

15   Q.  So you did not read this paragraph is what you're saying?

16   A.  I probably didn't more than likely.

17   Q.  In fact, you testified on direct you didn't read anything in

18   this agreement, did you?

19   A.  No, I probably skimmed over some things.  Probably the main

20   information that I probably paid attention to was the

21   information where I needed to sign.

22   Q.  And you testified on direct that you did not read anything

23   in that online handbook that it references, correct?

24   A.  I never sat down and studied the handbook, no.

25   Q.  You testified on direct you did not look at the handbook at

1   all, correct?

2   A.  Probably didn't.

3   Q.  And so you're saying that when you swore to this, that was a

4   lie, right?

5   A.  Well, I'm not saying --  I wasn't saying that at the time.

6   I just didn't read the fine print.

7   Q.  So the fine print says you read the fine print, doesn't it?

8   A.  Let me see.  I mean, of course I'm going to put my --  my

9   correct information as far as my name and address, so I wouldn't

10  lie about that so --

11  Q.  Right.  This says by signature that you're certifying,

12  you're promising you read the online handbook and all the

13  regulations but you didn't?

14  A.  I didn't read the handbook.  I didn't go that far.

15  Q.  So that was a lie, right?

16  A.  If you can call it a lie, it wasn't an intentional lie.

17  According to this, it would be a lie.

18  Q.  Wellness Personal Care Service was your business, right?

19  A.  Correct.

20  Q.  You were the administrator?

21  A.  Correct.

22  Q.  You were the owner of the business?

23  A.  Correct.

24  Q.  You were the registered agent?

25  A.  Correct.

1  Q.  You were the director?

2  A.  I was the administrator and the registered agent.  I don't

3  know if I put my name as the director on any documents.

4  Q.  So I'd like to publish for the jury now Exhibit 16 and

5  specifically go to page 11 of that exhibit.

6           THE COURT:  Sixteen, one, six.  You may publish.

7           THE CLERK:  Judge, I don't have that in evidence.

8           THE COURT:  In terms of the stipulation?

9           MS. LOUNSBERRY:  Your Honor, it is covered by the

10  stipulation.  I don't necessarily need to admit the document if

11  the Court and defense are willing to publish, but I can read the

12  stipulation and admit if that is preferred.

13           THE COURT:  If you just reference it for me.

14           MS. LOUNSBERRY:  Yes, Your Honor.  That is Stipulation

15  Number 11.

16           THE COURT:  Which was not been read.  So if you want

17  to read it.

18           MS. LOUNSBERRY:  May I?

19           THE COURT:  Um-hum.

20           MS. LOUNSBERRY:  The parties stipulate that the

21  records contained in Exhibits 15 to 17 were produced by the

22  Wisconsin Department of Financial Institutions or DFI and

23  contain certified copies of official records or documents that

24  were recorded or filed in a public office as authorized by law.

25           The parties stipulate and agree that these records are

79

1    self authenticating pursuant to Federal Rule of Evidence 9024.

2         THE COURT:  All right.  So again, the jury will accept

3    those facts as true and as proven, and that is Exhibits 15

4    through 17.  So go ahead, Ms. Lounsberry.

5    Q.  So Mr. Monroe, do you see on the screen in front of you the

6    Wisconsin Department of Financial Institutions form entitled

7    Corporations Bureau Form 5 Domestic Nonstock Corporation Annual

8    Report.

9    A.  I'm sorry, it hasn't popped up on my screen.

10   Q.  Apologies.  How about now?

11   A.  Yes, ma'am.

12   Q.  Do you see that this was filed on behalf of Wellness

13   Personal Care Service?

14   A.  Correct.

15   Q.  And here where it says registered agent, do you see that

16   your name is registered as the registered agent?

17   A.  Correct, correct.

18   Q.  You were also the managing employee of Wellness Personal

19   Care Service, correct?

20   A.  Managing employee?  Yeah, I ran it most of the time by

21   myself.

22   Q.  In fact, you also filed paperwork with the state where you

23   use the title of managing employee, correct?

24   A.  I don't know.  For the most part, I probably put owner or

25   president or administrator.

1    Q.  Let's look at Exhibit 14, which has already been admitted

2    and published, especially page 3.  Mr. Monroe, do you see that

3    this is the Provider Application Screenings Internal Report that

4    you had to file every two years with Wisconsin Medicaid?

5    A.  Yeah.

6    Q.  And do you see that in addition to listing yourself as the

7    owner, you also listed yourself as the managing employee.

8    A.  Okay.

9    Q.  And you testified on direct, in response to one of your

10   attorney's questions, that the whole point of running a personal

11   care agency or acting as a middle man between Medicaid and PCWs

12   for to you manage those PCWs, right?

13   A.  Can you repeat that?

14   Q.  Yes.  You testified on direct that when you run a personal

15   care agency, your chief function is to manage PCWs, right?

16   A.  Correct.

17   Q.  You were the one doing background checks for PCWs, correct?

18   A.  Correct.

19   Q.  You were the one approving people to work as PCWs?

20   A.  Correct.

21   Q.  You were the one reporting those PCWs in that Exhibit 14 we

22   just saw to the state, right?

23   A.  Recording them, yes, yes.

24   Q.  And you also were the one who was choosing who you'd have

25   partnerships with in this business, right?

1  A.  Well, I didn't make that decision by myself.

2  Q.  Well, you chose Tammy Virgil Strong as a partner, right?

3  A.  Yeah, yeah, most definitely.

4  Q.  You also chose her to be an RN supervisor for your business,

5  right?

6  A.  Correct.

7  Q.  You chose her to be the person submitting the Medicaid

8  claims?

9  A.  Correct.

10 Q.  And yet in spite of wearing all of those hats, you filed a

11 W2 for her claiming she was only making a $1,000 bi-weekly,

12 right?

13 A.  Correct.  That's what she wanted to make.

14 Q.  You knew she'd run a personal care agency before, right?

15 A.  Correct.

16 Q.  And according to your standards, it was a "very successful

17 agency", right?

18 A.  Correct.

19 Q.  She was earning millions of dollars a year through her PCA,

20 correct?

21 A.  Correct.

22 Q.  In fact, she made in total around $42 million over the life

23 of that business, right?

24 A.  I wouldn't know that.

25 Q.  That is before her agency got shut down, right?

1    A.   Yes.

2    Q.   And that's the reason she didn't want to be on paper as your

3    partner, right?

4    A.   She never said that.  Like I said, she was going through a

5    divorce at the time, and her husband was trying to attack her

6    financially, so she didn't want --  She actually -- I think she

7    told me that situation got resolved with her agency, and she

8    could have opened it back up.

9    Q.   You weren't aware that she owed quite a lot of money to the

10   IRS?

11   A.   Yeah, she told me she owed money to the IRS.

12   Q.   And that is why she did not want to be on paper as making

13   anything more than that little $1,000 every couple weeks, right?

14   A.   Probably.

15   Q.   And that's why you listed her daughter, Tamisha, instead as

16   your business partner, right?

17   A.   No.  She said she wanted her daughter to be on paper, and

18   she wanted to be a silent partner.

19   Q.   Tamisha had really nothing to do with Wellness Personal Care

20   Service, did she?

21   A.   No, she probably helped Tammy with some things.

22   Q.   When you say probably, do you have any knowledge of that?

23   A.   Not physical or knowledge that I've seen her helping her

24   with anything.

25   Q.   So you're just making an assumption then?

1  A.  No.  She told me that one time she tried to teach Tamisha

2  how to bill because we didn't get paid one week, and I was,

3  like, why we didn't get paid, did you do the billing?  She

4  said -- We called Tamisha mu mu.  She said mu mu did the

5  billing, I tried to teach her how to do the billing, and we

6  didn't get paid, and so she had to re-bill.  And so that is --

7  That is how I knew she was helping her.

8  Q.  So other than the one failed billing, do you have any

9  knowledge of Tamisha being involved in the business?

10  A.  No, no.

11  Q.  And so you knew or understood from that provider agreement

12  that you had to disclose anyone with more than a five percent

13  controlling interest in your business, right?

14  A.  Well, Tammy was a registered nurse, so I didn't -- I never

15  saw any like --

16  Q.  Mr. Monroe, let me stop you.  My question is, you knew you

17  had to declare anyone with a five percent or more controlling

18  interest in the company, right?

19  A.  If I --  If I did, I probably --  If it was any forms where

20  I had to do that, I would put Tamisha name.

21  Q.  But Tamisha didn't have any control over Wellness, did she?

22  A.  No, she didn't.

23  Q.  Tammy did though, right?

24  A.  Yeah.

25  Q.  Tammy had, according to you, a 50 percent interest, right?

1  A.  Correct, correct.

2  Q.  So that was another lie that you told when you set up this

3  business, right?

4  A.  I wouldn't call it a lie.  I just --  I thought that people

5  could be silent partners with businesses.  I didn't know that it

6  was wrong.

7  Q.  You thought the five-percent rule did not apply to you?

8  A.  Well, I just didn't know anybody could not be --  I didn't

9  know if it was wrong for anybody to be a silent partner, wrong

10  or right.

11  Q.  You say you never showed Tammy these timesheets; is that

12  right?

13  A.  No, I checked over the timesheets.  She didn't really

14  specifically see the timesheets that were filled out, the

15  physical timesheets in the office.

16  Q.  And you're saying you would just verbally confirm to her

17  weekly that she should just go ahead and bill; is that right?

18  A.  Well, not actually in that manner.  When we did payroll,

19  when we entered into Paychecks, I went over all the employee

20  timesheets that dropped a single -- outside of Phil, the

21  Wellness Personal Care clients and employees.  I went through

22  their timesheets when I entered in their pay to make sure that

23  they worked every week, everyday of the week.  Because sometimes

24  they would bring a timesheet, it might be filled out half of the

25  week or one day out of the week.  That mean they didn't work the

85

1  full week, and maybe the client was in the hospital.  Sometimes

2  they would be honest.  Sometime they wouldn't.  We checked them

3  to make sure they were in, make sure everything was signed and

4  did the paychecks.  So that was to that extent.

5  Q.  So she was again taking your verbal signal to go ahead and

6  bill without seeing any documents?

7  A.  Correct.

8  Q.  You were the one who looked at the documents, right?

9  A.  I looked at the timesheets, correct.

10  Q.  You said you'd review everybody but Phil's clients, right?

11  A.  Timesheets.  So I wouldn't just particularly just go through

12  every timesheet when they drooped them off.  As long as I knew

13  they were there, we paid him.  Because we paid according to the

14  employee dropping off the timesheet or not, timesheets.  If an

15  employee did not drop off their timesheets for the week, we

16  would hold their paycheck until they dropped off the timesheet.

17  Q.  So you're saying that you would go ahead and bill and pay

18  without reviewing the timesheets; is that right?

19  A.  Well, she would bill the week after -- the week after the

20  timesheet.  So if we did payroll, she would bill the following

21  week.  So I forgot how she worded it, it is, like, a week after

22  a certain way you bill.

23  Q.  And you were collecting these timesheets weekly, right?

24  A.  Correct.

25  Q.  But you reviewed all the non-Phil ones and none of the Phil

1  ones?

2  A.  Say that again.

3  Q.  You reviewed all of the ones that came from people other

4  than Phil's people, but you didn't review any of Phil's people's

5  timesheets?

6  A.  I reviewed them not at the moment of payroll.  I had to go

7  through each employee's specific timesheets, so I didn't want to

8  pay them, you know, more than what they worked.  The

9  timesheets -- So say if a client go to the hospital, the agency

10  doesn't know that.  An employee might not call when they go to

11  the hospital.  They would just fill out the timesheet according

12  to that.  So if a client is in the hospital, obviously an

13  employee can't work.  So they were instructed not to fill out

14  the days if --

15       So I'm talking to the employee.  If a client goes to

16  the hospital, you are not to fill out the timesheet because, you

17  know, you have to be away because you're not in the house with

18  the employee managing the employee.  It's home care services.

19  I'm at the office.  So all I can do is trust that they are doing

20  their job and being honest about it.

21  Q.  Mr. Monroe, I am going to bring us back to the question.  So

22  the question was, you're not reviewing the timesheets in the

23  moment that Phil brings them in?

24  A.  I'm just --  not going over directly.  I just make sure he

25  got his bulk in, and I would record that we have to write a

1  check for him to pay his employees.

2  Q.  But you couldn't know what that amount was until you

3  reviewed the timesheets, could you?

4  A.  Well, no.  I knew what the amount was because whatever --

5  She would bill according to however many units the client had,

6  so it wouldn't, you know --  Like sometimes he would call, like,

7  if a client went to the hospital, he would let us know that so

8  and so went to the hospital or so and so, so those timesheets,

9  him or whoever he would have collecting the information at the

10 time.  So did I specifically go over each timesheet?  No, I

11 didn't.

12 Q.  So in other words, what you're telling us is that you had

13 Tammy billing every week according to the maximum number of

14 units approved for a client, right?

15 A.  Well, she just billed according to, you know, whatever --

16 Yeah, she billed after the week we did payroll.

17 Q.  Cause that's what you wanted her to do, right?

18 A.  That's how --  That's how --  I didn't per se you bill.  She

19 just ran it the way she knew how to run it.  I never questioned

20 that.  I never knew how to bill.  I don't know how to bill and

21 didn't know how to bill, so I let her -- I trusted her knowledge

22 in that area.

23 Q.  Mr. Monroe, if the timesheets had nothing to do with it, you

24 wouldn't review any of them, would you?

25 A.  Say that again.

1    Q.   If the timesheets had nothing to do with the billing, you

2    wouldn't review any of them, would you?

3    A.   Well, timesheets -- It did.  Basically timesheets, you

4    wanted to make sure that the records is right in the office, so

5    you just -- you want to make sure because you can get a physical

6    audit at any time.  You need timesheets.  They have to turn in

7    timesheets.  Timesheets is record keeping of employees getting

8    paid, and it was proof that an employee worked.

9    Q.   You knew that you had to keep those timesheets for, at

10   least, five years, right?

11   A.   Yeah, we had to keep all client files for five years.

12   Q.   And you just said that was because your business could be

13   audited, correct?

14   A.   Well, yeah.  You follow -- You follow those rules according

15   to, you know, the state.

16   Q.   So yes?

17   A.   Yeah.

18   Q.   And you knew that if an audit happened, someone from the

19   state could come and say show me the timesheets, right?

20   A.   Well, if they come -- They actually did a physical audit one

21   time.

22   Q.   Mr. Monroe, it is a yes or no question.

23   A.   Yes.

24   Q.   And so you kept those timesheets not only because of an

25   audit but also because you understood from Medicaid's rules,

1  your billing had to be based on the timesheets, right?

2  A.  Yeah, I kept those records because that's the way the

3  business was ran.  I ran the business the way it was supposed to

4  be ran.

5  Q.  You're saying you kept those papers because it said on paper

6  you had to keep them, right?

7  A.  No.  Well, I didn't read that part.  Tammy told me that we

8  had to keep the client files in the office for five years

9  because we had clients that left, we had clients that passed

10  away, and I couldn't shred that and throw it away.  We had to

11  keep it in the office, so it had to stay filed in the office.

12  We had the conversation at one point.

13  Q.  It sounds like you didn't read much; is that accurate?

14  A.  I read as much as I could.  Honestly as far as the handbook

15  and so on and so forth, I just relied on my cousin knowledge.

16  She had a successful agency for ten years, so I trusted she

17  would give me the right information on running the business.  I

18  just didn't read everything like that.

19  Q.  So is that a yes or a no?

20  A.  No, I didn't read everything.

21  Q.  And so you thought that you could make millions of dollars

22  off of this venture without even knowing what the rules of the

23  game were?

24  A.  No, I mean I relied on my cousin, and I learned from her.

25  When we first started the agency, I didn't have a clue on how to

1    run an agency at all.  We talked everyday for those years that

2    we ran the business and whatever she wanted me to do.  I had

3    some business experience in little areas.  I knew how to form

4    the LLC.  You know, I sold cars.  I had a little dealership so

5    on and so forth.

6            Other than that, I never ran an agency, so I didn't

7    have a clue on how to run an agency, but I wasn't scared to do

8    it with her because she knew how to run an agency.

9    Q.  So you were engaging in this business without actually

10   knowing the rules of the game, correct?

11   A.  I don't think anybody know all the rules to any business, so

12   no, I didn't know all the rules.

13   Q.  The rules aren't unknowable, are they?

14   A.  No, they are not.

15   Q.  The rules are right there in that six-page agreement that

16   you signed, one page of which is just a signature page, right?

17   A.  Well, you know, I don't think --  I didn't think or don't

18   think that my cousin would tell me to do anything illegal.

19   Q.  You knew that in order to submit a claim to Medicaid, it had

20   to be "truthful, accurate and complete", right?

21   A.  Yeah with my information, of course.

22   Q.  And that had to be truthful, accurate and complete according

23   to the timesheets.  That is their function, correct?

24   A.  Well, we didn't submit timesheets to Medicaid.

25   Timesheets -- They was just records that were supposed to be

1  kept in the office.

2  Q.  They were records that were supposed to be kept because you

3  had to bill according to and only according to the timesheets,

4  right?

5  A.  No, not according to the timesheets.  From my understanding,

6  she just billed according to the units that the client had.

7  Q.  So it is your testimony today that your business was not

8  billing according to the timesheets; is that correct?

9  A.  Well, only time they didn't bill according to the timesheets

10  is if the worker didn't work.  Like I said before, however many

11  days out of that week or if the client was in the hospital or so

12  on and so forth.  Sometimes we billed when the client was in the

13  hospital because the PCW didn't let us know that a client was in

14  the hospital, so you don't know unless they tell you.

15  Q.  Mr. Monroe, did your business or did it not bill according

16  to the timesheets?

17  A.  Yes.

18  Q.  So now, you're saying that you did review and only submit

19  bills for those services marked in the timesheets?

20  A.  Like I said, she billed what she billed afterwards, but we

21  didn't go specifically --  We just relied -- You got to rely on

22  the PCW to be honest in this business.  You can't just know

23  everything what's going on outside.  It's impossible.

24  Q.  Mr. Monroe, let me move on.  You got the money from Medicaid

25  deposited into an account that you had set up in the name of

1  Wellness Personal Care Service, correct?

2  A.  Correct.

3  Q.  But once it was deposited there, you quickly moved it into

4  other accounts, right?

5  A.  Well, the week that the company got paid, I moved money out

6  of course.

7  Q.  You did that because Phillip Daniels gave you advice that

8  that was a smart move for you, right?

9  A.  Not because Phillip Daniels gave me advice that that was a

10  smart move.  One thing he did tell me, he told me that you can

11  create an LLC --

12  Q.  Mr. Monroe, it was a yes or no question.

13  A.  No, he didn't.

14  Q.  And so you knew that if you moved the money out of that

15  account, it would be harder for Medicaid to trace and recuperate

16  that money if they found some evidence of fraud, right?

17  A.  No because Medicaid recouped money before.  Medicaid

18  recouped money before they send money.  So if they had to recoup

19  any money whenever she did billing, that money wouldn't come to

20  the agency, so they didn't recoup it after payment.  If we found

21  out --

22  Q.  Mr. Monroe, let's just listen to the questions that are

23  asked please, okay?

24  A.  Yep, yep.

25  Q.  So then when you moved that money into another account,

1  those accounts were also in the name of Wellness Personal Care

2  Service, correct?

3  A.  Correct.

4  Q.  However even though they were in the name of Wellness

5  Personal Care Service, you were using those for your personal

6  expenses, right?

7  A.  I spent money from Wellness Personal Care account for my

8  personal life, yes.

9  Q.  A trip to Dubai is not a business expense, correct?

10 A.  It wasn't a business expense.  It was my anniversary,

11 wedding anniversary.

12 Q.  Building your home is not a business expense, right?

13 A.  No, it's not a business expense.

14 Q.  Buying cars for yourself is not a business expense, right?

15 A.  Well, the BMW I got was under the business, so I used that

16 to drive back and forth to work everyday.

17 Q.  Your Dodge Demon was not a business expense, was it?

18 A.  I drove it, but I bought it under the business.

19 Q.  You took sole responsibility for managing your personal care

20 workers, correct?

21 A.  Yes.

22 Q.  You were aware, based on your Medicaid agreement, that when

23 it came to the actions of your contractors, employees, the buck

24 stops with you, right?

25 A.  The actions of my employees?  Can you repeat that?

1  Q.  Yes.  You know that under the Medicaid Provider Agreement,
2  you took on the responsibility for your employees, right?
3  A.  Correct.
4  Q.  You had every reason for that to be in their business,
5  right?
6  A.  Every reason to be in the employee's business?
7  Q.  Yes.
8  A.  I mean, you know --  You can't be in people business like
9  that to a certain degree, you know, like their information,
10 their Social Security Number, their birth date, background
11 check.  But as far as me in their personal life, no, they were
12 employees.
13 Q.  Mr. Monroe, I'm not asking about their personal lives.  You
14 needed to be on top of what they were doing for work, right?
15 A.  Yeah, yeah.
16 Q.  They were working for you, correct?
17 A.  Correct.
18 Q.  You were billing Medicaid based on the representations that
19 they were making and the work they were allegedly doing, right?
20 A.  Yeah.
21 Q.  Their business was literally your business, right?
22 A.  Well, yes in the same sense with the state allowing agencies
23 to manage people that need healthcare services.  They trust that
24 the agencies are going to do the job that they are supposed to
25 do.  So if I hire employees, I trust that they are going to do

1    the job that they are supposed to do.

2    Q.  So you had every reason to stay on top of your PCWs, right?

3    A.  Yeah.

4    Q.  You also had every reason to check in with your clients,

5    right?

6    A.  Yeah, yeah.

7    Q.  You had every reason to make sure that the PCWs were

8    actually coming to do the work?

9    A.  Yeah, I trusted they did, but I didn't check everyday.  I

10   relied on the client to let me know.  That if the PCW don't show

11   up, that's why we left an admission in the house and the client

12   grievance.  There's been instances where clients called me and

13   let me know that they don't want the PCW or the PCW isn't doing

14   the job or whatever, and then I will rectify the situation.

15   Q.  You've had instances where clients have called you to

16   complain that they didn't get their package, right?

17   A.  No.

18   Q.  You never had a client call you to say they didn't receive

19   the money they were expecting?

20   A.  No.

21   Q.  You testified earlier "I really didn't know how he --

22   meaning Phil -- structured his employee situation", right?

23   A.  Not really.

24   Q.  You also testified you didn't even know if his PCWs and the

25   clients that he referred to your agency were related to one

1   another, right?

2   A.   No, cause I really didn't know them personally like that, so

3   I didn't know if they were related to the client or not.

4   Q.   But you knew that all of them were related in some way to

5   Phil and Roy, didn't you?

6   A.   The only one that I knew that was related to them was Leroy

7   Junior, and I knew that Joelle was his wife, and that's it.

8   Q.   You never found in two and-a-half years whether anybody else

9   was related to the two of them?

10  A.   No, that wasn't really a concern of mine.

11  Q.   You didn't know Leroy Henton was Roy Henton's son?

12  A.   Yeah, I knew that, and he told me Pops was his father,

13  excuse me.

14  Q.   So you didn't check up on your clients to find out if they

15  were happy with their cares, did you?

16  A.   No, I did not.  When the nurse would go see the client, I

17  relied on that.  And Phil never really gave me phone numbers on

18  his clients like that.  Unless the nurse needed to do an

19  admission, the nurse would have to get in touch with one of them

20  so they can be at the house.  But other than that, I didn't

21  really communicate with his clients like that.

22  Q.   You didn't communicate with his PCWs either, did you?

23  A.   Not all of them.  Some of them.

24  Q.   You didn't check up on the work that those PCWs were doing,

25  did you?

1  A.  I didn't really check up on the work that any of the PCWs

2  was doing in the agency.  I didn't go to visit houses and check

3  and see if they were doing the work.  I relied on them doing

4  what they were supposed to do and drop off the timesheets.

5  Q.  You didn't check up on Phil's PCWs because you already knew

6  it was impossible for them to be doing the work they claimed,

7  right?

8  A.  No, not really, no.  That's just not a practice that I did.

9  Q.  When you say not really, it was slightly impossible or what

10  do you mean?

11  A.  Well, when I say not really, I don't know if any of the PCWs

12  do everything that they are told to do because there is no one

13  at the house managing them.  In a demographic of people you're

14  dealing with, you know, you just trust that they are going to do

15  what they are supposed to do.  It you get a complaint, you deal

16  with it.

17  Q.  Didn't you just testify that you were the one managing them?

18  A.  Yeah.

19  Q.  But you didn't manage them is what you're now telling us.

20  Is that true?

21  A.  Well, they did PCW in client's homes, so they live in

22  different homes.  I didn't go to each house and go and check and

23  see if they were doing work.  That wasn't my job description,

24  and I don't know if it was one of the policies and procedures.

25  Q.  Mr. Monroe, let me stop you.  Didn't you just testify to

1   this jury that that was exactly your job description as the

2   managing employee?

3   A.  Yeah, I manage them as far as checking the timesheet, and I

4   didn't call when they came in.  We talked when they picked up

5   checks so on and so forth.

6   Q.  To manage your employees, you collected timesheets?

7   A.  They dropped of timesheets.

8   Q.  And that's it, right?

9   A.  I guess.  I did office work.  It was too much work to do in

10  the office to go to everybody house to make sure they going to

11  work and doing what they supposed to do.  It's just impossible.

12  Q.  Mr. Monroe, this is a claim you made several times now,

13  right, that you're too busy to know what's going on with your

14  business?

15  A.  No, not to busy to know what's going on with my business.  I

16  just do everything that I should do and everything that I can do

17  and get it done for the day and come back tomorrow and finish

18  the work the next day.  That's just basically it.

19  Q.  When you were arrested and interviewed by the agents in this

20  case, you told them you were too busy for these things, didn't

21  you?

22  A.  I don't remember exactly everything they asked in the

23  interview.  I just was as honest as possible in the interview.

24  Q.  But you've repeatedly told us today you were just too busy.

25  You've used that phrase, right?

99

1    A.  I was too busy to do what you were suggesting that I

2    probably should do according to you.

3    Q.  You heard the clip -- Let me back up.  It's not according to

4    me, is it?  Do I set the rules for the Medicade Program?

5    A.  You're asking me questions.  And, you know, I just ran the

6    agency according to the knowledge that when I started with my

7    cousin and according to what she told me.  I wasn't an expert in

8    running an agency or running a business with employees for that

9    matter.

10   Q.  According to you, you didn't know the first thing about

11   running an agency like this, did you?

12   A.  No, I didn't know how to run an agency.

13   Q.  You told investigators when you were interviewed that you

14   were just a one-man office, right?

15   A.  For the most part.  I hired my step daughter once, my

16   daughter worked for me once, and my son, my 25-year old son,

17   worked for me once.

18   Q.  In the clip we heard, you went a step further, you said you

19   didn't even need anyone in the office with you?

20   A.  I felt like I didn't need anybody in the office.  The reason

21   why I stopped them from working is cause I would go behind their

22   files and check and see if they filed paperwork right, and they

23   wasn't filing paperwork right, so I felt like if I do it, it

24   will be done correct, so I didn't --

25   Q.  So the answer is yes, you did not feel like you needed

1  anyone else in the office with you, right?

2  A.  I didn't feel like I did.

3  Q.  Even though you're telling us today that you had so much

4  paperwork, you couldn't do your basic function of being the

5  managing employee?

6  A.  That is probably an imperfection of mine thinking I can do

7  everything.

8  Q.  And you didn't need anyone in the office even though in the

9  year 2020, for example, you were managing the care of 66 clients

10 at once, correct?

11 A.  Well, the PCW is supposed to take care of the client, but I

12 just took care of the office work, so I didn't feel like I

13 needed anybody.  I felt like I can file paperwork on my own,

14 call doctor offices and fax paperwork and email by myself.

15 Q.  Wellness Personal Care Service was making well over a

16 million dollars every year, right?

17 A.  Yeah.

18 Q.  You could have hired some help if you had needed it, right?

19 A.  Yeah, I could have.

20 Q.  You could have afforded that?

21 A.  Yeah, I think so.

22 Q.  But instead, you chose to take on that responsibility for

23 knowing what's going on in the business, didn't you?

24 A.  Well, I felt like you have to pay a person a substantial

25 amount more than what, you know, Tammy we would come to an

101

1    agreement on paying somebody to do paperwork.

2            So I don't want to try to hire somebody to help me in

3    the office that I couldn't pay sufficiently to do things right.

4    Because if I could pay somebody sufficiently to do things right

5    and not be in the office, I most definitely would have done it.

6    Q.  So you couldn't pay somebody right out of a couple million

7    bucks a year?

8    A.  Well, you know, you got payroll, you know, the company make

9    money.  Half of the couple million dollars a year go to payroll.

10   Q.  But that's not what your bank records show, is it?

11   A.  I wrote a lot of employees checks, so paper checks so --

12   Q.  Let's go through the things that kept you so busy.

13   Mr. Daniels was the one out recruiting clients for the business

14   not you, right?

15   A.  No, he recruited clients.  He wasn't the only one.

16   Q.  Pops was the one taking these clients by and large to the

17   doctor to get them checked out to get them signed up right not

18   you, right?

19   A.  No, I didn't take clients to doctors.

20   Q.  And you weren't the one running around town to check on

21   these clients and see how they were doing on a daily basis, were

22   you?

23   A.  I didn't do that with any of my clients.

24   Q.  You weren't the one doing the nurse screenings because

25   you're not a nurse, right?

1  A.  Correct.

2  Q.  And you weren't the one getting the plans of care approved

3  because that was Tammy's function, right?

4  A.  Well, she filled out the plan of care.  The agency --  I

5  think she faxed the plan of care to the doctor's office.  The

6  doctor had to approve the plan of care.  I didn't fill out a

7  plan of care.

8  Q.  You weren't involved in that plan of care process at all,

9  were you?

10  A.  No.

11  Q.  You weren't the one allegedly calling clients or visiting

12  them every 60 days to find out who had COVID 19 because Tammy

13  allegedly was doing that too, right?

14  A.  Well, at first when I had Melissa, and if I can explain it

15  to you.  She was diligent about that.  She liked going to do

16  that.  So when Melissa and, you know, I would pay for each

17  visit, and they also got paid for admissions for each visit.  So

18  when she wasn't able to work for me anymore and Annie did it,

19  she couldn't handle doing the 60-day visits.

20        And at that time probably when I hired Annie was after

21  COVID.  So from my knowledge and from my understanding, we could

22  do 60-day supervisory visits over the phone, and we could also

23  do admissions over the phone.

24  Q.  Mr. Monroe, let me stop you.  That is not the question.

25  A.  I'm sorry.

1  Q.  You were not doing 60-day nurse visits, were you?

2  A.  No.

3  Q.  You are not a nurse, are you?

4  A.  No.

5  Q.  You didn't make the adds for Wellness Personal Care Service.

6  You don't even remember anymore who did, right?

7  A.  Well, I know I went through -- probably found somebody that

8  can print out and do those kind of things, but I didn't do it

9  myself.

10  Q.  That was not your function, correct?

11  A.  No.

12  Q.  You were not the one completing the timesheets because these

13  so-called PCWs were supposed to be doing that, right?

14  A.  They were supposed to complete out their timesheets.

15  Q.  You were not the one providing cares to the clients because

16  frankly no one was doing that, right?

17  A.  Well, the PCW is supposed to do that.  When we first opened,

18  I did, I took care of clients that needed help.

19  Q.  You admit that none of Phil's PCWs were taking care of any

20  clients, don't you?

21  A.  Do I admit?  I know that now.  I didn't know it while the

22  business was open.

23  Q.  You weren't the one out buying cigarettes for clients

24  because Michelle Hauck and Joelle Massey took care of that,

25  right?

104

1    A.  I did not.  They probably did if that's what they did.

2    Q.  You weren't the one inputting claims into the Forward Health

3    Portal because Tammy did that, right?

4    A.  Correct.

5    Q.  So that leaves you as the guy in charge of the timesheets,

6    right?

7    A.  Yeah.

8    Q.  And so far as we've reviewed today, your sole function is

9    that paperwork of the timesheets and the other things in the

10   client files, right?

11   A.  That wasn't my sole function.  I did a lot of things in the

12   office like call doctor's office, printed out admission folders,

13   stacked them up for the nurses, filed employee folders, just did

14   a lot of paperwork and a lot of phone calls.

15   Q.  You're describing a lot of clerical work?

16   A.  Right.

17   Q.  You were a glorified secretary for WPCS?

18   A.  If you want to call it a glorified secretary, that is no

19   problem.

20   Q.  You had told case agents when you were interviewed that you

21   reviewed every timesheet personally, didn't you?

22   A.  Yeah.

23   Q.  But now you're telling us you did not do that, isn't that

24   right?

25   A.  No, that's not what I'm saying.  I'm saying I didn't review

1   all the timesheets right away.  They piled up and piled up and

2   piled up, and then I reviewed them so that I could file them.

3   Q.  When you say they piled up and piled up and they piled up

4   and you finally reviewed them, that was well after you had

5   already billed for those weeks of service, right?

6   A.  No.  So the employees --  My employees outside of Phil when

7   I did their payroll, I went over their timesheets.  Phil would

8   drop off all his employee timesheets at one time, so I didn't go

9   over each specific timesheet that he had dropped off or that he

10  dropped off.  But later on when I would file the timesheets

11  because I didn't even file the employees that dropped off the

12  timesheets every week timesheets right away because it is just

13  too much to go through the folders generally, punch holes in

14  them, put them in date order, make sure everything is in order.

15  So no, I didn't do that right away.

16  Q.  In fact, you did the billing before you did the reviewing,

17  right?

18  A.  I mean, she billed the week after timesheets were submitted,

19  so I guess you can say that, but I didn't review them spot --

20  No, I didn't no, not right away.

21  Q.  In fact, you just told the jury that was too tedious for you

22  to do, right?

23  A.  Well, to go over every timesheet and make sure and file it,

24  yeah, it's a lot of work.  It was just too much to go over it at

25  that time.

106

1  Q.  Even though that was the only work that fell to you?

2  A.  That's what I'm trying to explain to you.  That wasn't the

3  only work that fell to me.  I had a lot of different functions

4  in the office.

5  Q.  You told the jury that you never created any sample sheets

6  in this case because Tammy took care of that, right?

7  A.  Yeah, she's the nurse.

8  Q.  But when you did look at timesheets, you noticed they were

9  all filled out exactly the same, right?

10  A.  When employees dropped them off, I had the sample timesheets

11  sitting on my desk in a folder so that I can check the

12  timesheets, and I gave every employee a sample timesheet so that

13  they can know how to correctly fill out a timesheet because some

14  people -- The type of information is complicated, so they didn't

15  have to call me.  And then they still called me sometimes even

16  though they had a sample sheet just to ask a question so --

17  Q.  So the question was, when you collected and reviewed those

18  timesheets, you noticed that they were all filled out in the

19  same way, right?

20  A.  Yeah, they were supposed to be filled out according to what

21  the sample sheets looked like.

22  Q.  And the sample sheets were all the same as one another too,

23  right?

24  A.  Yeah, Tammy created the sample sheets according to whatever

25  care they had, I would assume.  I mean, I know that.

107

1  Q.  And it is your testimony that all 141 of your clients needed

2  the same cares as one another?

3  A.  I never really went over the cares on the timesheets, like,

4  that just wasn't my thing.  When the client got approved, Tammy

5  created the timesheet and emailed it to me.  I printed it out

6  and put it in the sample folder.

7  Q.  When you looked at how those timesheets were filled out, you

8  saw that the same mileage was entered on time sheet after

9  timesheet even if the PCW changed?

10  A.  The same milage wasn't entered on every client's timesheet.

11  I did the mileage.  I submitted it in MapQuest.  And whatever

12  mileage I sent Tammy, that's the mileage that she recorded on

13  the timesheets.

14       Now, with Phil clients, for example, when I would ask

15  him some of his PCWs address, I notice he gave me the same

16  address for his PCWs, so I didn't know how he ran it.  Maybe he

17  had them meet everywhere.  As long as he gave me the address

18  that they were leaving from and the client that they were going

19  to, that's what I submitted in the MapQuest.

20       MS. LOUNSBERRY:  I'd like to publish what's already

21  been admitted into evidence as Exhibit 204.

22       THE COURT:  204.

23  Q.  Mr. Monroe, do you see that this is supposed to be a

24  timesheet for client Denise Koceja?

25  A.  Koceja, right.

1   Q.  And do you see that at the bottom, the mileage for Michelle

2   Hauck is noted as 10.3 miles each day?

3   A.  Yeah.

4   Q.  If we change to Page 2, do you see Kenisha Dison is also

5   claiming 10.3 miles for the same client?

6   A.  I see it.

7   Q.  Do you see on Page 3 that Rhonda Kelly is also claiming

8   10.3 miles for the same client?

9   A.  Right.

10  Q.  And Delores Gillard is also claiming 10.3 miles to travel to

11  the same client?

12  A.  Correct.

13  Q.  On Page 5, Maria Castaneda is claiming 10.3 miles to the

14  same client, right?

15  A.  Correct.

16  Q.  And Paris -- whatever the last name may be there -- is also

17  claiming 10.3 miles to the same client?

18  A.  Correct.

19  Q.  And on the next page, Taylor Love is also claiming

20  10.3 miles to the same client?

21  A.  Correct.

22  Q.  On Page 8, Jameel looks like is says Brody, is also claiming

23  10.3 miles to the same client?

24  A.  Yeah.

25  Q.  And on Page 9, Christopher Daniels is also claiming he

109

1  drives 10.3 miles to the same client?

2  A.  Right.

3  Q.  You noticed that when you looked at the timesheets, didn't

4  you?

5  A.  I didn't specifically pay attention to the milage and count

6  the mileage like that.  To be honest, no, I didn't.  I didn't

7  notice that.

8  Q.  Well, you billed for travel time, didn't you?

9  A.  Tammy billed.  She did all the billing so --

10  Q.  And you know that Tammy billed for travel time, right?

11  A.  Yes, most definitely.

12  Q.  In fact, you know that Tammy billed for travel time not

13  according to the milage on the timesheets, but just an hour a

14  day for everyone regardless of the distance, right?

15  A.  Say that again.

16  Q.  You know that Tammy billed not according to the mileage but

17  an hour of travel time per day per client, right?

18  A.  I don't know how she did the billing at the time.  But if

19  that's what you guys say, then maybe that is what it is.

20  Q.  You noticed that even people's family members when they were

21  PCWs were all filling out timesheets alleging the same exact

22  services as Phil's clients were supposed to be getting, right?

23  A.  Whatever way she created the ADL and the timesheets, they

24  were supposed to do it according to the timesheets.

25  Q.  And again, you know that's not realistic to think

1   100 percent of your clients needed precisely the same cares on

2   the same days, right?

3   A.  I never looked at timesheets and said, okay, why is this --

4   I didn't do that.  Whatever Tammy printed out, she sent it to

5   the agency.  That's what I filed in the sample folder.

6   Q.  You said you gave Nyla Collins' daughter a hard time for

7   submitting photocopied timesheets, right?

8   A.  Correct.

9   Q.  Because you knew that she was just duplicating one timesheet

10  as though it were for multiple different weeks, right?

11  A.  Correct.

12  Q.  And that would not be a truthful, accurate and complete

13  timesheet because it simply is copied from one week to the next?

14  A.  Correct.

15  Q.  And yet that's actually what you wanted everyone to do every

16  week by hand instead of using a machine, right?

17  A.  Well, no.  I think that the business from what I remember,

18  they needed -- It had to be filled out correctly.  When I see a

19  timesheet is printed out, I'm like, well, you printed this out.

20  You need to fill this out.  You can't just print it out the --

21  whatever cares they were supposed to do, whatever cares that

22  were supposed to be done on the timesheet.  Did they mark them

23  as they were doing it?  I assume they wouldn't.  I assume they

24  would do what they were supposed to do and mark it on the

25  timesheet.

111

1    Q.  So your expectation of the PCW is that they were going to

2    hand copy timesheets precisely every week instead of using a

3    machine to do that?

4    A.  No, no, no, not just hand copy but do it correct according

5    to the sample sheet.  But if you didn't work on certain days,

6    according to the sample sheet, you don't fill out those days.

7    You fill out the days you work and so on and so forth.  If you

8    didn't work this day, you don't fill it out.

9    Q.  Well, you notice week after week after week, you were

10   getting timesheets filled out exactly the same with seven days

11   across the week marked, right?

12   A.  If that's what they wrote on the timesheets, that is what I

13   assume they done.

14   Q.  These timesheets were not about the actual hours of care

15   done or the cares provided for you, right?

16   A.  Well, they were supposed to be about the actual hours and

17   the actual cares that were done.

18   Q.  When you looked at them, you could see they were not, right?

19   A.  Say that again.

20   Q.  When you looked at them, you could see they were not, right?

21   A.  I never scrutinized whatever the nurse put on the timesheet.

22   I am not a nurse.  I can't -- I didn't scrutinize everything and

23   say hey Tammy, why is she getting this everyday?  I never did

24   that.

25   Q.  Is it your testimony you would have to closely scrutinize

1  the timesheets to see all the sample boxes are filled out all

2  the same way every week for every client?

3  A.  I don't -- I don't think they were filled out for every

4  client the exact same way.  I think the timesheets were

5  different from client to client.

6  Q.  Did you see the exhibits that have been published here in

7  court this week that they are all the same?

8  A.  What do you mean, every timesheet?  I don't think every

9  timesheet is the exact same.  I would assume they're not.

10 Q.  You didn't see all the exhibits with the sponge bath every

11 day of the week but Wednesday?

12 A.  I saw that you guys pointed that out, but that is something

13 that I never really noticed when I was working or paid attention

14 to.

15 Q.  So in two and-a-half years of collecting these timesheets,

16 it never hit that you across literally thousands of them, that

17 they all looked the same?

18 A.  Well, I never really looked to see if every patient is

19 getting the same care.  I just -- When she printed out the

20 timesheet, when she emailed me the timesheet, I printed it out

21 and filed it.

22 Q.  But you were also involved in "fixing" the timesheets if

23 they came in looking incorrect, right?

24 A.  Yeah, I did that according to the sample that was in the

25 office that she sent to me.

1  Q.  You would actually change what a PCW wrote on the timesheet

2  if a box was missing, right?

3  A.  No.

4  Q.  It's your testimony you never marked an X in a box to fix a

5  timesheet?

6  A.  I don't think so.  I probably had called the employee and

7  asked them, you know, if you forgot to mark or whatever.  But

8  for the most part, I would have them correct a timesheet or come

9  in and correct a timesheet, so that's not a practice that I

10  would do.  I knew that that was something they had to do.

11      Now, what I did on timesheets with probably new

12  employees, I probably -- The top part where the client name go,

13  I probably wrote the client name right there and wrote the date

14  in there.  But as far as the signature and filling in the Xs so

15  on and so forth, no.

16  Q.  Mr. Monroe, a timesheet without signatures is not valid, is

17  it?

18  A.  Yeah.  I wouldn't pay if I didn't see a signature.

19  Q.  Timesheets with forged signatures would not be valid, would

20  they?

21  A.  If I knew somebody was forging a timesheet, of course, it

22  wouldn't be valid.

23  Q.  You've seen the exhibits that have been published here in

24  court showing all of that different handwriting and all the

25  different spellings of client's signatures, right?

114

1  A.  Correct.

2  Q.  You would agree with me those signatures must be forged,

3  correct?

4  A.  You know what, I know it look bad, I just did not scrutinize

5  everybody signature.  That's something I didn't do.  I went over

6  the timesheet, the signature there because sometime I write my

7  signature down just scraggily, so I didn't scrutinize

8  signatures.  Sometimes I fill it out full with my name.

9  Sometime I just put LM.

10 Q.  Do you ever write a different name for yourself than Lenard?

11 A.  No.

12 Q.  Do you ever write a different name for yourself than Monroe?

13 A.  No.

14 Q.  So if you saw that, that would be evidence that that was not

15 your signature?

16 A.  That would be a problem.

17 Q.  And in fact, if it happened repeatedly over and over again,

18 that would be a serious red flag, would it not?

19 A.  Most definitely.

20 Q.  You've seen during the trial the overlapping schedule

21 exhibits showing PCW in up to eight places at once.  Timesheets

22 alleging they are in eight places at once are not truthful,

23 accurate and complete, are they?

24 A.  That they are in eight places at once?  Repeat that

25 question.

115

1  Q.  Can a person be in eight places at once?

2  A.  No, no, no, no.

3  Q.  So a timesheet alleging they are in eight places at once

4  cannot being truthful, accurate or complete?

5  A.  That's impossible.

6  Q.  Just like it's impossible to work a 53-hour day, correct?

7  A.  100 percent.

8  Q.  So when you are collecting timesheets that just have the

9  same handful of names on them over and over again, you have

10  reason to know those services cannot have been provided as

11  alleged, correct?

12  A.  Well, if I'm --  I mean, when I am checking the timesheets

13  and I'm going through and just making sure everything filled

14  out, I am not looking at numbers.  I am just making sure

15  everything is filled out, and I'm not really specific like that.

16  So as long as the signatures are there and one thing I would pay

17  attention to is the dates.  I will pay attention to the dates at

18  the top of the timesheet to make sure that their dates were in

19  correct.

20  Q.  You knew if one PCW signed off on hours that amounted to 53

21  in a day, that would be impossible, correct?

22  A.  If I seen it, I most definitely -- If I noticed it, I would

23  have said something about it.

24  Q.  So it's your testimony again that in the course of two

25  and-a-half years, you never noticed all these instances that

116

1    we've shown?

2    A.  You know what, I know you guys scrutinize everything to the

3    third degree because that's your job, but I didn't scrutinize

4    everything that hard.  I didn't.

5    Q.  But you said you collected these timesheets weekly, correct?

6    A.  Correct.

7    Q.  So when you got a stack of them for a week, you could see

8    whose names were on them for that week, right?

9    A.  Well, I could see that they were filled out and the client

10   name would most definitely have to be clear because I had to

11   know what file that timesheet went in, so that would have to be

12   printed out.

13   Q.  So if you saw the same PCW signature on five or six or seven

14   or eleven different client's timesheets for a week, that would

15   be a red flag to you, would it not?

16   A.  For five or six or seven.  But Joelle was supposedly taking

17   care of three clients at one time.  It depends on the hours.

18   Some client might have got one hour of service that day.  That's

19   possible.  I mean, other agencies do it all the time.

20   Q.  So you are saying that if you saw one PCW signing off on 11

21   different timesheets for the same week, you wouldn't even pause

22   to add up the hours?

23   A.  If I saw --  If I noticed timesheets and that a PCW claiming

24   they took care of 11 people in one week, I most definitely would

25   question that, and I wouldn't be stupid enough if I'm doing

1  criminal activity to file something like that.

2  Q.  Well, again, you didn't file it with Medicaid, did you?

3  A.  Say that again.

4  Q.  Again, you did not file those timesheets with Medicaid, did

5  you?

6  A.  That wasn't a required practice.

7  Q.  Right.  You just put them away into the client's files,

8  right?

9  A.  Yeah, I made sure they were put away.  I mean, if they did a

10 physical audit, the timesheet was still in the office.  So if

11 they wanted to come to the office, they would be able to see the

12 timesheets.  It's not like you hiding anything.

13 Q.  You were papering those files just in case a couple of them

14 got looked at, right?

15 A.  Say that again.

16 Q.  You were papering or putting papers into those files in case

17 they got looked at, right?

18 A.  I was just filing the paperwork in the office because that's

19 way the office business is supposed to be ran.

20 Q.  You were counting on the fact that someone was not going to

21 spend the hours and hours that this investigative team has spent

22 putting together the pieces that you could easily see when you

23 collected the weekly timesheets, right?

24 A.  No, I wasn't counting on that fact.  I wasn't thinking that

25 far.  I wasn't thinking.  I didn't think this was going to

118

1  happen.  I thought I was doing everything right.

2  Q.  You knew it was important for those timesheets to be

3  accurate, correct?

4  A.  Yeah, most definitely.

5  Q.  Because you understood that that is what the Government was

6  paying you for was work according to those timesheets, right?

7  A.  Yeah.

8  Q.  Many of your original clients had family members as their

9  PCWs, right?

10  A.  Yeah.

11  Q.  But when you teamed up with Phillip Daniels, you transferred

12  a lot of these people away from their family members to his

13  personal care workers, right?

14  A.  I didn't transfer a lot.  My Auntie Claudia, we gave her to

15  Joelle.  Ricky Kilgore, he went to jail and got out of jail, and

16  he wanted supportive care, so I referred him to Phil.  Ricky

17  Kilgore -- I referred Ricky Kilgore for supportive care.  Those

18  are the only ones I can remember, not a lot.

19  Q.  Let's talk about Claudia Virgil.  She was your aunt,

20  correct?

21  A.  She passed away.  She's my aunt.

22  Q.  She was receiving care originally from a family member,

23  right?

24  A.  Right.

25  Q.  That was her granddaughter?

1    A.  Correct.

2           MS. LOUNSBERRY:  I would like to publish at this time

3    what's been admitted into evidence as Exhibit 180, specifically

4    going to page 156.

5           THE COURT:  One eight zero.

6           MS. LOUNSBERRY:  Yes, Your Honor.  I will start with

7    page 1.

8           THE COURT:  Okay.

9    Q.  Mr. Monroe, you recognize Ms. Virgil's name on this form?

10   A.  Correct.

11   Q.  You recognize the name of her granddaughter back in 2018 for

12   her caregiver?

13   A.  That's my little cousin Gernice.  I think that's Gernice.

14   Q.  You recognize your auntie's signature at the bottom of this

15   form, correct?

16   A.  Correct.

17   Q.  So you'll agree with me then if we go to page 156 of this

18   agreement -- I'm sorry -- of the timesheets.

19   A.  I can't see anything.

20   Q.  Can you see it now?

21   A.  Yep.

22   Q.  You notice in the bottom, that is not her signature, is it?

23   A.  No, that looks like -- says maybe Joseph I would assume.

24   Q.  That's not her signature below it either, right?

25   A.  I mean, it should be Claudia's signature.

1  Q.  It should be but it is not, is it?

2  A.  It don't match the signature you should showed me before.

3  Q.  In fact, you know that her name is Claudia, not Claudice?

4  A.  Right.

5  Q.  You wouldn't or shouldn't have accepted a timesheet that

6  read like that, should you?

7  A.  I didn't pay attention to that.

8  Q.  What if we go to the next page.  Would you agree with me

9  that is even a different version of her signature down at the

10  bottom?

11  A.  Most definitely.

12  Q.  And you'd agree you recognize that as not her signature?

13  A.  Well, I don't know which one is really her signature, but it

14  is not the same as the two signatures that you should showed me.

15  Q.  Let's go to the next page, 158.  Would you agree with me

16  that this signature down at the bottom doesn't match either of

17  those?

18  A.  Maybe.

19  Q.  Would you agree with me her name is not spelled correctly in

20  this signature?

21  A.  I wouldn't say that.  That would be subjective because

22  people just write cursive, and they write letters the way they

23  write them.  If it was printed, I could probably say that, but I

24  wouldn't allege that.

25  Q.  But again, you told us that you were looking at things like

121

1   the top part of the timesheets, right, the dates that are

2   written right below that name?

3   A.  Right.

4   Q.  So if you were checking out the dates, you would have seen

5   the one that said Claudice at the top, right?

6   A.  I mean people write sloppy.  You know, I know by glancing

7   that that is Claudia.

8   Q.  You know that by glancing that Claudice is not Claudia,

9   right?

10  A.  You know what, I couldn't tell you what it says.  It looks

11  like Claudia and Virgil really looks clear.

12  Q.  If we go to page 159, you would agree with me that this is

13  an entirely different signature again, correct?

14  A.  Yeah according to this.  Yes, most definitely.

15  Q.  All right.  What about page 160?  You would agree with me

16  this is another variation on her signature?

17  A.  Yeah.

18  Q.  Page 161.  This is not her signature either, is it?

19  A.  I would say not.  I would say it's not the same signature as

20  the other signatures.

21  Q.  Page 162.

22  A.  Yeah.

23  Q.  Page 163, that's not her signature, is it?

24  A.  Of course.  It's not the same signature as the other

25  signatures.

122

1  Q.  And if you had even glanced at the signatures to verify that

2  the form got signed by someone, you would have realized that she

3  was not the one signing these forms, correct?

4  A.  If I would have scrutinized it like that, maybe.

5  Q.  Are you saying that it takes scrutiny to realize that is not

6  her signature?

7  A.  When you got to sit down and file timesheets and they

8  stacked up like that and you want to make sure they are filed,

9  you are looking at the sample, you going through them, check

10  them, put it to the side.  Go through check, put it to the side.

11  You don't really just make sure the signature matched the other

12  week's signature.  You don't do that.  That is just --

13  Q.  That's too much to ask?

14  A.  I mean, you would be filing timesheets forever if you did

15  that.

16  Q.  You knew your auntie was getting cash instead of cares,

17  correct?

18  A.  I knew my auntie was getting cash most definitely.  We gave

19  her money.

20  Q.  You knew it wasn't ironic that she got her cash when the

21  Medicaid payments came in, correct?

22  A.  Well, no.  Tammy said look, mama want.  Imma give my mama

23  $150 every other week, so I'm giving her -- She gave her money.

24  It's Tammy's mother.

25  Q.  I want to talk about Theaster Beverly.  Ansen Beverly Davis'

123

1  uncle was one of your clients?

2  A.  Yes.

3  Q.  And Ansen was a friend of yours, correct?

4  A.  Yeah.

5  Q.  And so you knew that Theaster Beverly was a man with the

6  names in that order, correct?

7  A.  Yeah, yeah.  I figure he was a man, Theaster.

8  Q.  You knew that the name wasn't Beverly Theaster, a women's

9  name, right?

10  A.  Yeah, I noticed that yesterday.  If you pull up the sample

11  sheet, that's probably how the sample sheet was filled out.  You

12  know on some forms, people ask you to sign your last name first

13  so --

14  Q.  Well, more than just accepting timesheets that had it

15  written as Beverly Theaster at the top, you accepted dozens of

16  timesheets that had it signed Beverly Theaster at the bottom,

17  right?

18  A.  From what I seen yesterday, yeah.

19  Q.  And that told you that it couldn't actually be Theaster

20  Beverly signing off on those sheets, right?

21  A.  No, that wouldn't tell me that.  That would tell me they

22  probably think the last name is supposed to be signed before the

23  first name.  Excuse me if I am getting a little -- I don't want

24  to be rude.

25  Q.  Even if it is signed B period Theaster?

124

1    A.   If one was signed that way, I probably didn't notice it B

2    period Theaster.  I'm sorry, I wouldn't notice that.

3    Q.   So let's go to Exhibit 139, which has already been admitted

4    into evidence.  Starting on the first page, you see that these

5    are the timesheets for Mr. Beverly, correct?

6    A.   Correct.

7    Q.   And you can see that allegedly it is Ansen Beverly who

8    signed them, right?

9    A.   Yeah.

10   Q.   And yet the signature under all of these is B Theaster

11   instead of Theaster B or Theaster Beverly or something to that

12   effect, right?

13   A.   Yes.

14   Q.   Ansen knows his own uncle's name, right?

15   A.   Right.

16   Q.   And so that leads you to believe that is not only Theaster's

17   signature, it is not Ansen's signature either, right?

18   A.   No.  Like I said, that's probably the way the sample sheet

19   was when I gave it to Ansen, so he probably just filled it out

20   according to the way the sample sheet was made.  If you guys

21   would show the sample sheet, it probably matched what the sample

22   sheet says.

23   Q.   So Ansen filled out the wrong name to mirror a sample sheet

24   rather than writing his uncle's own name?

25   A.   Well, me myself personally and I probably noticed that it

125

1    was that way and probably just didn't want to tell Tammy to

2    change it because some forms you got to fill your last name out

3    before you fill out your first name, so that wasn't a big deal.

4    Q.  Mr. Monroe, no one else's files have the last name first, do

5    they?

6    A.  Correct.

7    Q.  And in fact, if we go to page 24 of this exhibit, we can see

8    again a fuller version of it where it is very easy to read at

9    the bottom that it is signed B Theaster, correct?

10   A.  Correct.  That would allege, in my opinion, that the

11   sample -- whoever --  I would think that is Maria Castaneda.  I

12   don't know how to pronounce, that she filled it out according to

13   the sample sheet.  That was the instruction for the business.

14   Q.  And so you billed Medicaid every week during this period for

15   services allegedly provided to Theaster Beverly even though the

16   timesheets didn't have his correct signature; is that right?

17   A.  I would --  I would --  I would assume that that was his

18   correct signature.  I wouldn't think that he would have a false

19   client signature on there.

20   Q.  Even though that is not his name?

21   A.  Well, that is his name.  It is written down backwards.  I

22   sign multiple things multiple times with Monroe Lenard.

23   Q.  Let's talk about Phillip Daniels.  You needed Phillip

24   Daniels to refer clients to you because you didn't have the

25   volume that you wanted on your own, right?

126

1    A.  No, I didn't need him to refer me clients.  We had, like, 30

2    to 40 clients when I met him.

3    Q.  But you had far more clients than that after you met him in

4    2020 and into 2021, right?

5    A.  He --  He referred me -- Maybe if a client wasn't active so

6    the most clients that I ever had active with him probably

7    throughout the couple years we dealt with each other is probably

8    30 to 40.

9    Q.  But again, you would agree with me we've reviewed 51 files

10   during this trial that he was responsible for and the vast

11   majority of which he brought to you?

12   A.  I don't remember how many files that we reviewed through

13   this trial honestly.  I know none of my clients outside of

14   Phil's were reviewed at all.

15   Q.  Mr. Monroe, the point of Ansen Beverly-Davis introducing you

16   to Phil was for Phil to increase the volume of your business,

17   right?

18   A.  Most definitely.

19   Q.  And you've testified here today that you were struggling

20   because you couldn't afford to pay the same going rate that IRIS

21   paid their PCWs, right?

22   A.  No, I didn't say we were struggling.  I know at the time the

23   state was probably paying, like, $19 an hour for -- I think, so

24   don't quote me on that.  IRIS paid their employees probably $15

25   or $16 an hour.  So if the state is paying the small agency $19

127

1  an hour, if you pay your employee $15 an hour out of the $19 an

2  hour, the agency can't make any money.

3  Q.  So you have said that you were paying your PCWs that you had

4  before you knew Phil ten bucks an hour?

5  A.  Correct and some 11.

6  Q.  But you were struggling to compete with other agencies that

7  were paying 15, right?

8  A.  No, just IRIS.

9  Q.  It wasn't a red flag for you when Phillip Daniels came along

10  saying he can make it happen for $8 an hour?

11  A.  No.  I told him that I pay -- He said he wanted to pay his

12  employees, so I asked him how do you pay your employees?  He

13  said they all got a card.  I said, okay, I pay my employees $10

14  an hour.  He said no, I want to pay my employees $8 an hour but

15  just give me the $10 an hour.  I said okay.

16  Q.  That was not a red flag to you that he was saying he could

17  increase the number of clients that you had all while paying

18  PCWs only $8 an hour?

19  A.  No because I gave him the money to pay for payroll.  I gave

20  him money to pay payroll.

21  Q.  So even though you were struggling to find PCWs who would

22  take ten, you didn't think twice about Phil saying he had a

23  bunch who would take eight?

24  A.  No, some people probably work for $8 an hour in my

25  assumption at that time.

128

1   Q.  Mr. Monroe, you knew it was cheap because the work wasn't

2   actually being done, right?

3   A.  No.

4   Q.  Your Medicaid Provider Agreement says every time you submit

5   a claim, you are swearing that you didn't give or receive any

6   money for client referrals, right?

7   A.  Repeat that again.

8   Q.  The Medicaid Provider Agreement you signed says every time

9   you submit a claim to Medicaid, you are swearing and affirming

10  that you have not given anybody money in exchange for client

11  referrals?

12  A.  I don't remember reading that, but that's not a legal

13  practice.

14  Q.  Giving someone a referral fee in exchange for them sending

15  clients to your healthcare agency is a crime, right?

16  A.  Now I know it is.

17  Q.  And that is exactly what you were doing, right?

18  A.  Well, I offered referral fees, and I also went to -- They

19  had like a WISPA meeting in Madison they would have every once

20  and a while, and they urged agencies -- The state urged agencies

21  to offer a referral fee.

22  Q.  Mr. Monroe, you were paying Phillip Daniels referral fees in

23  exchange for him bringing clients to your personal cares agency,

24  correct?

25  A.  We called it that, but the $2 an hour was really just for

129

1  the work he was doing.  We called it a referral fee.

2  Q.  It was because he was referring clients to you.  That's why

3  it is called a referral fee, right?

4  A.  I didn't pay him upon referring a client to the agency.  I

5  just paid him when a client got approved, and he did everything

6  that he had to do, he would get $2 an hour to manage the client

7  and the employee.

8  Q.  Because you only wanted to pay the referral fee if the

9  referral was successful, correct?

10  A.  Well yeah, for any referral fee.  Yes, most definitely.

11  Q.  He gave you a choice about the structure of the referral fee

12  that you could pay.  Either a flat rate upfront or a continual

13  lower rate?

14  A.  Most definitely.

15  Q.  And so you chose to pay him about $20,000 a month in

16  referral fees, right?

17  A.  It built up to that.

18  Q.  Because the volume of business that he brought to you made

19  that investment worth while, right?

20  A.  Yeah, that was just our agreement.  For every client that he

21  referred that got approved, he was paid $10 an hour --  $2 an

22  hour and eventually $3, sorry.

23  Q.  Back in 2019, you were paying him that referral fee in cash,

24  right?

25  A.  I did at the beginning.

1  Q.  Until that got your account flagged and shut down by the

2  bank, right?

3  A.  No, I don't think that is why my account got flagged because

4  he wasn't that much at the beginning.  Just the payroll was kind

5  of a little bit big.  I just wasn't comfortable with pulling a

6  lot of cash out of the account like that.  That was just me.  I

7  think it got flagged because I did eventually open up --  I

8  don't know why it got flagged.  I can assume why it got flagged,

9  but the bank never told me why they closed my account, why they

10  ended our relationship.  I don't know why it got closed.

11  Q.  Mr. Monroe, it was your testimony today that Tammy told you

12  to write consultant fee on the referral fee checks, right?

13  A.  Probably.  Yeah most definitely as time went on.  Like I

14  said, I didn't fill in the memo.  Okay, this is a business that

15  we got going and a business agreement, I thought, well, maybe I

16  should write something in the memo.  I think I initially wrote

17  referral fee, and Tammy probably told me no, write consultant

18  fee and whatever.

19  Q.  She did that to make it look like a legitimate business

20  expense, correct?

21  A.  I wouldn't --  I didn't question why at the time when she

22  told me to do it.  I just did it.

23  Q.  You just did it even though that's not really what the fee

24  was for?

25  A.  Well, I would think that would be a consultant fee.  I mean,

1  it is almost like a subcontract, and he's making sure that his

2  clients go to the doctor.  He's making sure that my nurse get in

3  touch with the client.  He's making sure the PCWs do what they

4  have got to do.  He's collecting timesheets.  I would assume

5  that that would be consulting.

6  Q.  But Mr. Monroe, you just testified and you told agents

7  previously in your interview that this was a fee that you paid

8  to Mr. Monroe in exchange for him referring clients to your

9  business?

10  A.  Most definitely.

11  Q.  So it is a referral fee, right?

12  A.  You can call it that.  That's what we called it.

13  Q.  Well, you called it that on at least one check, right?

14  A.  Oh yeah.

15  Q.  Instead of writing consultant fee, you forgot that you were

16  supposed to disguise that and you wrote referral fee, right?

17  A.  I wasn't trying to disguise anything.  I wouldn't say I

18  forgot.  It was, like, a disguise I am doing something clever

19  like that.  I don't operate like that.  That's not the reason

20  why.  I was instructed to do it that way.

21  Q.  All of those checks on them that say consultant fee are

22  really for the referral fees, right?

23  A.  And the other one is payroll.

24  Q.  If I show you Exhibit 46, which is already in evidence,

25  specifically page 60, this is the one that actually says

132

1  referral fee in so many words in the memo line, right?

2  A.  That was late, like, in '21.  So, you know what, yeah, I

3  probably just wrote it on there that way.

4  Q.  And that's your signature on the signature line of this

5  check?

6  A.  That's most definitely my signature and my handwriting

7  period, yeah.

8  Q.  Your counsel asked you several questions during direct

9  examination about what was in your client's files.  Do you

10  remember those questions?

11  A.  Yeah, to a degree.

12  Q.  And you remember that there was something called a grievance

13  form in those files, right?

14  A.  Yeah.

15  Q.  And you said that you filed this form in those files, right?

16  A.  Yeah, in the client files.

17  Q.  And you said that you knew what this form was for, right?

18  A.  I mean, I would obviously know what a grievance form is for

19  I mean just --

20  Q.  You said that you never read that form before today,

21  correct?

22  A.  Have I sat down and analyzed it, like, what is the --  I

23  knew it was a grievance form.  I haven't analyzed it.

24  Q.  You said that there were notes inside of these files that

25  were supposed to be documenting supervisory nurse visits, right?

1  A.  Notes inside the files that were supposed to be documenting.

2  Admissions, I think they needed the notes when they did

3  admissions, not sup visits.

4  Q.  There were also notes that had a heading at the top that

5  said about the 60-day visits that were stamped with Tammy

6  Virgil's name on it?

7  A.  Those were supervisory visits, right.

8  Q.  Those were the ones you were saying during COVID could be

9  made by phone?

10  A.  Correct.

11  Q.  They could be made by phone so long as there was actually a

12  chance to observe the personal care worker, right?

13  A.  I don't know if the personal care worker had to be at the

14  house during the time.  Was it a rule?  I don't know if that was

15  a rule that the PCW had to be there or not.  I don't think so.

16  Q.  After listening to Inspector General Baize's testimony, do

17  you now know that that is a rule that they had to be there to be

18  observed, that that is the point of the 60-day visit?

19  A.  I don't remember him saying that specifically.  But if he

20  said that, I am quite sure it is a rule.

21  Q.  You didn't read those either, did you?

22  A.  The --  No, I didn't read them and just analyze them like

23  that cause I'm not a nurse.

24  Q.  You said that you just filed them away?

25  A.  I filed them when they were done, yeah.

134

1  Q.  But Tammy wasn't the one filling out the forms with her name

2  on them, was she?

3  A.  No.  Well, Tammy filled out forms, the ones she did over the

4  phone, and she mailed them to the office after she filled them

5  out.

6  Q.  That wasn't Tammy Virgil Strong's handwriting that we were

7  seeing in those we looked at it?

8  A.  Now I know that.

9  Q.  You didn't realize that was not your cousin's handwriting at

10  the time?

11  A.  I never scrutinized her handwriting like that.

12  Q.  You were also asked about Client Responsibility Form, a

13  Clients Right's Form and the Nurse Signature Form.  Do you

14  remember asking -- your counsel asking whether you recognize

15  those documents?

16  A.  Specifically the ones that you are saying, I wouldn't say

17  that, oh yeah, I remember him showing me admission forms.

18  Q.  Do you remember laughing when he asked you if you actually

19  read those documents?

20  A.  I probably did.  I probably doing a little bit up here

21  probably.

22  Q.  You laughed because to you, that was just not something at

23  all that you would do, right?

24  A.  Probably.

25  Q.  You've talked a lot about the hole punches at the tops of

135

1    the papers that go into these client files, right?

2    A.  I don't think I talked a lot about them, but I mentioned it.

3    Q.  It's possible to slide a piece of paper into a file folder

4    without putting hole punches even if the rest are punched,

5    right?

6    A.  If I had done that, I probably would put it in the client's

7    file until I had time to get back and punch the holes in it and

8    put it in especially with the admission because I wouldn't let

9    those stack up because those didn't come in frequently.

10          If the admission -- So say, for instance, a client had

11   been with the agency for two years and so for the most part,

12   they had to get annual admissions.  So if admissions were done

13   and the nurse would drop it off, I would probably just take it

14   and stick it in the folder until I had time to go back and punch

15   the holes in it and file it.

16   Q.  So yes, it is possible to put something in the folder

17   without punching it?

18   A.  Most definitely.

19   Q.  Let's talk about Lee Ellis.  Do you recall counsel asked you

20   some questions about your knowledge and relationship with him?

21   A.  Say that again.

22   Q.  Do you recall that your counsel asked you some questions

23   about your knowledge of and your relationship with him?

24   A.  Yes.

25   Q.  And you testified that he was referred to you by Tammy?

136

1    A.   Correct.

2    Q.   So is it just ironic that that's Phil's accountant too?

3    A.   Later on she told me that I think after I talked to

4    Mr. Ellis.  I don't know how Phil name came up.  She told me --

5    I think I asked her how did you meet Mr. Ellis, and she told me

6    Phil gave her Mr. Ellis information.

7    Q.   When you meet Lee Ellis, he saw several different red flags

8    in the way that you were withdrawing money from your accounts or

9    the things that you were documenting or not documenting, right?

10   A.   He just probably, like, a lot of money being taken out of

11   the account or whatever, something like that.

12   Q.   He saw that a lot of money was not payroll but was coming

13   out in cash or checks to yourself, right?

14   A.   I don't know how Tammy and Tamisha that took out money from

15   the bank, but I definitely wrote checks from one business

16   account to the other business account which is Wellness, but I

17   didn't make it a practice of pulling out cash.  I don't like to

18   carry -- I didn't like to carry a lot of cash.  I think that's

19   dangerous, so I didn't practice that.  I used debit cards and

20   credit cards and cashier checks because I also wanted to keep a

21   paper trail.

22   Q.   When you say that you moved a lot of money out of that

23   business account into your other business account, you mean the

24   personal account disguised as a business account, right?

25   A.   No, it's not a personal account.  It's the business account,

1    but I used that account on personal things, but I didn't file

2    yet.  So this is just coming back to me.

3         When we first started the business, I think Tammy told

4    me whenever you want to spend money on yourself, you transfer it

5    to your personal account so that way you can file on it so you

6    don't spend it from the business account.

7         I think when I met Mr. Ellis, he told me don't do

8    that.  You know, you can borrow from the business, and you can

9    file later.  So basically that's why I used the business account

10   for personal things.

11   Q.  You told agents when you were interviewed you only used that

12   account for personal things, right?

13   A.  I don't remember.  They came and got me at 5 o'clock in the

14   morning.  I probably -- I was still in my pajamas.  I probably

15   said that.  I don't know.  I had a personal account with BMO as

16   well as a business account, and I had a personal account with

17   Wellness as well as -- not Wellness but Wells Fargo as well as a

18   personal account, so I had a personal account at BMO.

19   Q.  Again, we reviewed all the kinds of spending that came out

20   of the account like the trips to Dubai, the trips to California,

21   the trips to Vegas, right.  We agreed those are not business

22   expenses, right?

23   A.  No, they are not business expenses.  I wouldn't say that.

24   Q.  Is it your testimony that you only said that those were all

25   personal expenses because it was 5:00 a.m.?

138

1    A.   No, they were personal expenses.  I'm saying that now.

2    Q.   And so you didn't claim any of that money on your taxes

3    either, did you?

4    A.   That is what me and Mr. Ellis was supposed to get together

5    about.  We never got together to file the taxes and get

6    everything.  I had to get all the information to him.  He stayed

7    busy, and I stayed busy.  Both of us was busy.  He had his

8    business, I had my business.  We were going to go around to it.

9    He would call me, man, we need to get together and handle this

10   business.  I am okay, we going to get together because we had to

11   sit down and go over everything.  We had to go over how I used

12   the debit card.

13   Q.   Mr. Monroe, the question is you did not claim that money

14   that you spent on yourself on your personal taxes, right?

15   A.   No, I didn't.

16   Q.   Then, Lee Ellis counseled you to try to make things look

17   more official, right?

18   A.   No, he counseled me to do things the right way.  We wanted

19   to do things the right way.  I just --  I don't operate like

20   that to do to make things look official.  I want to do things

21   official, not look.

22   Q.   Like writing kickback checks to Phil instead of giving him

23   cash?

24   A.   I don't know those were kickbacks.  I didn't know it was a

25   kickback.  I didn't know it was illegal.

139

1   Q.   You've testified that you issued 1099s?

2   A.   Most definitely.

3   Q.   You have also stipulated in this case that the IRS doesn't

4   have any 1099s for your business, right?

5   A.   Mr. Ellis was supposed to file the 1099s.  He printed the

6   1099s and gave them out to me.  And also if you guys went

7   through my employee applications, they had 1099 agreements in

8   their application, whether they wanted personal checks or 1099

9   because I knew if you pay somebody over $600 in cash or check,

10  that they had to get 1099.

11  Q.   But you stipulated again that there weren't any on file with

12  the IRS, right?

13  A.   No, I didn't stipulate that.  I thought that Mr. Ellis did

14  his job and filed.  He's most definitely printed out all the

15  employee 1099s.  He emailed them over to me.  I gave all my

16  employees they 1099, and I gave him the employees' -- I emailed

17  him the employees that were 1099, and he was supposed to file

18  them that way.

19  Q.   Mr. Monroe, you know that Stipulation 16 in this case says

20  that if somebody from the IRS was called to testify, they would

21  testify the IRS has no record of any form of 1099s issued to any

22  employees of Wellness Personal Care Service, right?

23  A.   I'm aware of that now.

24  Q.   You used your status as a Medicaid provider in 2021 to apply

25  for COVID-19 relief funds through H-R-S-A or HRSA, right?

1  A.  Say that again.  I used my --

2  Q.  You used your status as a Medicaid prior to apply for

3  COVID-19 relief funds from HRSA?

4  A.  I mean, I wouldn't say -- I wouldn't word it that way I used

5  my status.  The email was sent to the agency to fill out if we

6  were eligible for COVID relief.

7  Q.  But you knew you were not eligible, right?

8  A.  I didn't know if I was not or was.  I just -- During that

9  time, I just filled out the application just to see if possibly

10  or whatever I could get COVID relief.

11  Q.  You knew for a certainty that COVID had not hurt your

12  business in any way, right?

13  A.  I didn't think so.

14  Q.  In fact, you knew that your business was stronger than ever

15  because you were getting the new client referrals from Phillip

16  Daniels, right?

17  A.  Not just because of the Phillip Daniels.  I just knew that

18  the agency grew, period.

19  Q.  Your revenues jumped quite a lot in 2020, right?

20  A.  Well, the revenues jumped every year except when it got to

21  the gross 2 million mark, it kind of stayed there for a while.

22  I think the last year before we closed probably grossed a little

23  more than 2 million.

24  Q.  And what you had gotten denied on before, that wasn't HRSA.

25  That was the ERTC or the Employee Retention Tax Credit, right?

141

1    A.   I didn't get denied employment ERTC.

2    Q.   Well, do you remember listening to the clip where you told

3    agents that you knew that you didn't take a loss because that is

4    why your ERTC application got denied?

5    A.   I probably said that.  I didn't get denied.  I don't know

6    why I said that.  I don't know.  It didn't get denied.

7    Q.   So when Mr. Ellis said you got denied, that wasn't true?

8    A.   That I got denied ERTC?

9    Q.   Yes.

10   A.   I don't remember him saying that.  I didn't get denied ERTC,

11   but I never received money from ERTC.  ERTC, the employee tax

12   retention, I did that with ERTC company over the phone.  And

13   from whatever records I sent them, they said that we will

14   receive, I think, maybe $90 thousand dollars.

15   Q.   Mr. Monroe, you knew that by filing that HRSA Provider

16   Relief Fund Application, you were claiming that your business

17   suffered a loss because of the pandemic, right?

18   A.   Our business -- Okay.  So that was the second ERTC.  So the

19   first ERTC --

20   Q.   Let me stop you.  I am not talking about ERTC?  I am talking

21   about the provider.

22   A.   HRSA.  I'm sorry, that was the second ER --  the relief

23   fund, the second one, the HR.  So we made more than we made on

24   the first one, so I filled out the application just to be

25   filling it out.  I didn't think whether I was going to get any

142

1    relief fund or not.

2    Q.   So are you testifying you didn't care whether you qualified

3    or not?

4    A.   I mean, I just filled out the application just to see if I

5    qualified.

6    Q.   But you knew what this application was for, right?

7    A.   I mean, at this time, companies were getting money, just

8    were getting aided money.  I didn't look at it -- If I didn't

9    take a loss whoever look over the application will say I am not

10   eligible for -- the company was not eligible for it.

11   Q.   Mr. Monroe, you've said before that you don't have any

12   training to be an accountant, right?

13   A.   Not at all.

14   Q.   But it doesn't take that kind of training to see that the

15   numbers that you put into your application are not correct,

16   right?

17   A.   Well, the --  The 1120 form that he gave me, the taxes, the

18   1.4 million, I thought that was wrong, and I mentioned it to

19   him, Mr. Ellis, when he sent me the form.  I think I called him

20   over the form and said I could have swore our business made 1.9.

21   He said, no, that's right or whatever.  And later on, he

22   misplaced one of the 1099s.  And I remember that specifically,

23   it was a Managed Health 1099 that we received, and it was for

24   $500,000, and he forgot to put that on the tax form that he sent

25   over to me.

143

1    So I figured that that was off.  I'm like, man, we

2    made 1.9.  We didn't make 1.4.  He said, I got all your records

3    right here.  You made that cause I brought all my 1099s to him.

4    Q.  When you discovered that error, you didn't contact HRSA, did

5    you?

6    A.  I don't remember when I discovered that error honestly.

7    Q.  You kept the money they issued you, right?

8    A.  Well, yeah, when they --  I didn't even know we were going

9    to get any.  I didn't know the agency was going to get any money

10   from HRSA.  It was a surprise to me.

11   Q.  It was a surprise to you even though all the numbers were

12   adjusted in a way that made you eligible?

13   A.  I didn't think the numbers were adjusted in a way that made

14   the agency eligible.  Honestly, I'm not that creative.  I don't

15   want to call myself dumb.  I'm not that savvy, but I'm not that

16   sharp, and I'm not a dummy.

17   Q.  Well, they were different than the numbers in your bank

18   records, right?

19   A.  I didn't go over all my bank records.  I didn't go over.

20   Q.  In fact, if you had gone over your bank records, all you'd

21   have to do to figure out your revenues is just add up with a

22   calculator the numbers from the Medicaid deposits, right?

23   A.  Well, I would go get the printout from the bank, and it

24   would be stacks, and that wasn't my job.  Again, that's

25   something that I'm not fixing to sit down and do.  That is what

144

1    I paid my accountant to do that.

2    Q.  Except for you didn't have Mr. Ellis to review the bank

3    records to come up with the number either, did you?

4    A.  He had all my bank records.  I printed them out and brought

5    them to him in stacks.

6    Q.  You testified that you were with him going over the

7    applications together, right?

8    A.  Just that part.  The first part I did at the office by

9    myself, me and Tammy over the phone.

10   Q.  And Mr. Ellis was not looking at your bank records to come

11   up with those revenues numbers, was he?

12   A.  Not sitting there right there in that.  I don't know if he

13   was going off of the forms that he gave me.  No, he didn't get

14   the bank records and say -- No, he didn't do that.

15   Q.  Mr. Monroe, he was taking those numbers from you, wasn't he?

16   A.  No.

17          THE COURT:  Ms. Lounsberry, I'm sorry to interrupt.

18   If we can find a stop to do a restroom break maybe.

19          MS. LOUNSBERRY:  Your Honor, are we okay if we go ten

20   more minutes?

21          THE COURT:  Anybody -- No, we're not okay to go ten

22   more minutes.  Let's take a quick break.  Please don't talk to

23   each other or anyone else, and we'll see you back.

24          THE CLERK:  All rise.

25          (Jury excused.)

145

 1           THE COURT:  Take a quick facilities break and come

 2    back.

 3           (Brief recess taken.)

 4           (Back on the record.)

 5           THE COURT:  Back on the record.  Sorry to cut you of.

 6    I had a juror on the end who was big eyed.  I didn't want to

 7    test that.  We're not ready, sorry.  But the second thing I

 8    wanted to, we don't necessarily have to resolve it now, but I

 9    want to throw out the thought given the fact that we are at ten

10    to 3:00, you've got a little more to go, obviously.  Mr. Fahl

11    may have additional, that we consider to have the jurors come

12    back on Monday for closing.  I am a little worried about not

13    being able to finish everything by 5:30.  If we don't, that

14    means we have to have CSO staff keep the building open.  We are

15    shut down as we all know.  And, you know, I don't want jurors to

16    feel pressured to, I guess, have to stay because other people

17    are staying.  I just wanted to throw that thought out there.  We

18    would still get it to me sooner than we told them we would get

19    it to them.  I don't know.

20           MS. LOUNSBERRY:  Yes, Your Honor.  Attorneys for the

21    Government were discussing that outside.  I think that it is

22    likely given the number of charges in this case that the

23    Government has to explain that this will not be, for example, a

24    20-minute closing or something.  And so we might wind up in a

25    scenario we're either here late causing the problems the Court

1  identified or bifurcating, which the Government would request

2  not to do.

3          THE COURT:  Mr. Fahl.

4          MR. FAHL:  I agree.  I don't like the idea of closing

5  and having them go away for a weekend and come back on Monday.

6  I rather have them start deliberating after closing.

7          THE COURT:  Okay.  Let's plan on that.  Once we finish

8  the defense case once the Government advices whether or not it

9  has the case, then we'll tell them we're going to let them go

10 over the weekend.  We see they have been working very hard and

11 come back on Monday to hear the instructions, closing argument

12 and the case will go to them.  Okay.  Thank you all.  Now, we're

13 ready.

14          (Jury enters.)

15          THE COURT:  Mr. Monroe, I'll remind you, you are still

16 under oath, and Ms. Lounsberry I cut you off.  Back to you.

17          MS. LOUNSBERRY:  Thank you, Your Honor.

18 (**By Ms. Lounsberry**.)

19 Q.  Mr. Monroe, when we broke, we were talking about Mr. Ellis

20 and the work he did for you.  Do you remember those questions?

21 A.  Somewhat.

22 Q.  You paid Mr. Ellis about $45,000 for his work for you,

23 correct?

24 A.  Correct.

25 Q.  That's a lot of money for a few page application, isn't it?

147

1    A.  Well, that was just -- I would drop off stuff to him and

2    have him do work, so I would pay him in a lump sum, give him a

3    lump some of money, make sure he's satisfied.  He got a lot of

4    paperwork.  I'm dropping a lot of stuff off to him.  To make

5    sure that he do everything right, that's what I paid him.

6    Q.  But you never got all that paper straightened out, did you?

7    A.  We didn't get a chance to finish, but I wanted to get to his

8    office and get it done eventually.

9    Q.  It's your testimony that he made a mistake on your taxes,

10   right?

11   A.  Correct.

12   Q.  And it's also your testimony that he didn't refer to

13   anything when he was coming up with the numbers for your

14   application that we were just discussing, right?

15   A.  No, he didn't -- He didn't --  I can't really -- I don't

16   remember him having, okay, here.  No, I don't remember that.

17   Q.  You testified that he was with you when you filled out that

18   application for the HRSA relief fund that we were looking at,

19   right?

20   A.  No, not the whole application.  I just went to his office

21   just to do the quarterly part.  For the most part, the stuff

22   before that me and Tammy, I did it myself on the computer, but

23   she was on the phone.  I would ask her what goes here.  Some

24   stuff I knew so like that, not the whole application, no.

25   Q.  You inputted the numbers that the application form itself,

148

1   right?

2   A.   Yes.

3   Q.   And you did that at your first, right?

4   A.   No, at Mr. Ellis' office.

5   Q.   I'm showing you what has already been admitted into evidence

6   as Exhibit 550.  Mr. Monroe, do you remember looking at this

7   document from AT&T?

8   A.   Yeah, a little bit.

9   Q.   And you remember whose name this is here that it shows was

10  the subscriber on the IP address for which that application was

11  filed?

12  A.   That's my name.

13  Q.   That application wasn't filed at Mr. Ellis' office, was it?

14  A.   The HRSA application?

15  Q.   Yes.

16  A.   It was filed from my computer from my office.

17  Q.   And, in fact, we know that it was filed from that

18  application past 9:00 p.m., right?

19  A.   Well, that address right there, that was the address to my

20  old office, years before I even got the HRSA.  So it wasn't

21  filed on the south side because I didn't even have that office

22  no more.  My office was on 76th and Townsend.

23  Q.   Let me republish Exhibit 550.  Do you see that the service

24  information has it listed as your office on Townsend?

25  A.   Okay, yeah, so I probably did file it that night from my

1  office, maybe.

2  Q.  And again, what we saw with the date and the time -- Well,

3  let's go to Exhibit 41.  And I'd like to specifically publish

4  page 12, the last page of this document.  Do you see that this

5  is the signature page where you submitted that HRSA Provider

6  Relief Fund Application?

7  A.  Uh-huh.

8  Q.  It has your name under the signer?

9  A.  Okay.

10  Q.  Do you see that?

11  A.  I see it.

12  Q.  And do you see where it says signature completed because it

13  was digital?

14  A.  Uh-huh.

15  Q.  You see right below there it notes the IP address we were

16  looking at showing it was from your office, right?

17  A.  I don't know how to read that information, but I trust that

18  you are giving the right information, yeah.

19  Q.  Then, do you see where it says timestamp, that it was signed

20  October 25, 2021, at 9:18 p.m.?

21  A.  Yeah.

22  Q.  You weren't working with Mr. Ellis at the time that you

23  submitted this, right?

24  A.  No.

25  Q.  You did that on your own, right?

1    A.   Probably more than likely because I didn't finish the

2    application in one day.  It took days probably to finish the

3    application.  Because if I can remember correctly, you can sign

4    off and come back and start where you ended it on the computer,

5    so it took time to fill out the application.  I didn't just one

6    day do all the work on it.

7    Q.   You had days to get the numbers in the application right,

8    correct?

9    A.   I probably had to wait on whatever information Mr. Ellis had

10   to send to me probably that and probably had to wait to get his

11   help or probably had to wait so me and Tammy could go over

12   everything.  You don't want to just, you know --

13   Q.   Mr. Monroe --

14   A.   -- do something I don't know, fill out something I don't

15   know how to fill out.

16   Q.   Mr. Monroe, I am publishing now the same exhibit, that

17   Provider Relief Fund Application, Exhibit 41, the second page.

18   A.   Correct.

19   Q.   Those are the numbers that you said you inputted, correct?

20   A.   Yeah.

21   Q.   These are the numbers that you had a couple of weeks to get

22   right, correct?

23   A.   I don't know how long it took to fill out the application.

24   This part of the application I had Mr. Ellis help me with.

25   Q.   And is it your testimony that it's just an accident that all

151

1   of the expenses are greater than actual?

2   A.  Well, the documents --  Whenever I sent that the quarter

3   documents to, I probably didn't go over everything and match the

4   numbers.  I probably just submitted it when he sent it to me.  I

5   mean from what we're saying now, I know it's inaccurate.  Like I

6   said before, I thought that the 1.4 million was inaccurate

7   because from my recollection, we made 1.9 million, and I brought

8   that to Mr. Ellis' attention, and he said, no, it's the right

9   information.  And later on, he filed the 1099 in office that it

10  was wrong.

11  Q.  So again, it is your testimony that you filed this

12  application feeling or knowing that the numbers in it were

13  inaccurate?

14  A.  No, I didn't feel it.  I trusted -- If he said they were

15  right, I thought maybe I was wrong.

16  Q.  You knew that it was impossible to give correct numbers for

17  your operating expenses because you didn't keep any records of

18  those things, rights?

19  A.  Say that again.

20  Q.  You knew it was impossible to give accurate numbers about

21  your operating expenses on your application because you didn't

22  keep records of your expenses, right?

23  A.  I didn't keep a record of the expenses, no, until he gave me

24  whatever he gave me.  Then, I would file it.

25  Q.  So when you submitted this application, you knew that

152

1   whatever number you put for the expenses was not going to be

2   right because you had no record of what your expenses were,

3   right?

4   A.  I just relied on his experience.

5   Q.  But his experience couldn't tell him what you spent, right?

6   A.  I gave him -- Like I said before, I gave him all of my bank

7   statements so on and so forth.  If I had to verbalize anything

8   that we spent at the company, I would verbalize it to him.

9   Q.  And your bank records showed that you were taking out almost

10  a million in cash, right?

11  A.  I thought that was funny.  I never took a lot of cash, a

12  million in cash.  I'm not sure to -- Excuse me.  That is just

13  laughable for me.  That is just not me.  I wouldn't take out

14  cash like that.

15  Q.  So are you saying that when Special Agent Klein testified in

16  2020 you took almost a million in cash, that that's not true?

17  A.  I know I never took --  It has to be untrue because I never

18  took out that much cash.  I don't think the company made that

19  much, and I know I didn't --  I didn't even pay Phil that much

20  in the whole time we was dealing with each other.  I don't

21  understand where he got those numbers from.

22  Q.  Mr. Monroe, you just testified you thought that 1.4 million

23  revenue number was wrong because it was actually 1.9 million?

24  A.  Right.

25  Q.  You knew the company made more than a million, right?

1  A.  I figured --  Of course, I knew it made more than a million,

2  yeah.

3  Q.  So when you just testified that you didn't know it made more

4  than 1 million, that isn't right?

5  A.  That I testified that it didn't make more than 1 million?

6  Q.  Correct.

7  A.  I didn't say I didn't know.  I said I didn't pull out a

8  million dollars in cash.

9  Q.  So you're saying that the bank records that show you pulled

10  out a million dollars in cash are wrong?

11  A.  I never saw him provide any bank records saying that I

12  pulled out a million dollars in cash.  I would like to see that

13  because I know I never pulled out a million dollars in cash.

14  Q.  So again, Mr. Monroe according to you, Special Agent Klein

15  is lying when he says that you did?

16  A.  I don't want to call the man a liar, but I know for sure

17  that that is just not a practice of mine to pull out cash.  I

18  don't like to carry cash, didn't pull out cash.  I'm just not

19  that type of guy.  I rather use debit card.  I don't like to

20  carry cash.

21  Q.  Mr. Monroe, according to you, Phillip Daniels was lying when

22  he said that you agreed with him to submit false Medicaid

23  claims, right?

24  A.  Say that again.

25  Q.  According to you, Phillip Daniels lied when he said you

154

1  agreed with him to submit false Medicaid claims?

2  A.  I'm sorry, Phil know I didn't play those type of games.

3  Q.  So you're saying he's lying when he told the jury that?

4  A.  100 percent.

5  Q.  You're also saying Ms. Massey lied when she said that you

6  knew that she made false timesheets for to you support those

7  claims?

8  A.  I wouldn't have never done that.

9  Q.  Michelle Hauck is lying when she said that you had her sign

10  a stack of blank timesheets to use in the future?

11  A.  I don't remember doing that with Michelle.  You know, I

12  don't remember doing that.  Now, if clients needed timesheets or

13  whatever, I probably would drop off timesheets to clients if

14  they didn't have transportation or they didn't have a printer

15  because that's another thing I did in the office is print off

16  timesheets, print off admissions, had to go to Office Depot to

17  get paper because we ran through paper.  I kept boxes of paper.

18  Q.  Is it your testimony that Michelle Hauck was lying when she

19  said you did that?

20  A.  I wouldn't call her a liar because I just don't --  That was

21  a long time ago.  I wouldn't remember what I had her do.

22  Q.  So is it your testimony it's possible you did have her sign

23  a stack of blank timesheets?

24  A.  I can't say that I had her sign.  I wouldn't have nobody

25  sign a stack of blank timesheets.  That don't make no sense.

155

1   Q.  Is it your testimony that Amanda Corrao was lying when she

2   said you were riding around with Pops handing out cash packages

3   to clients?

4   A.  I never saw Amanda Corrao in my life, and I thought that was

5   funny when she said that I had on glasses because I don't wear

6   glasses.  Those glasses that I got on in court, they just

7   designer.  I've got 2020-vision.  But in my older years, I need

8   reading glasses because I can't see close up, but I can see very

9   far away very clear, so I don't wear glasses.

10  Q.  You don't wear glasses other than the rest of the time we've

11  been sitting in court this week?

12  A.  I just bought those glasses probably last month, and I just

13  like the style of the glasses.  I just like the clean, clear Ray

14  Ban look.  Sometimes so I just wear them for style.

15  Q.  Your testimony is that Mr. Ellis was lying when he said that

16  he just took the numbers straight from you to put on these

17  applications?

18  A.  Mr. Ellis makes so many mistakes.  He did my wife taxes.  He

19  made a mistake on her taxes where I think she owed $3,000.  He

20  just made mistakes all the time.  He had --  He did so much,

21  doing so many people taxes.  Mr. Ellis made mistakes.

22  Q.  Mr. Monroe, bottom line, is it your testimony that all these

23  people are lying, but you're the only one telling the truth?

24  A.  The people that I said were lying, they most definitely were

25  lying.

156

1  Q.  Is it your testimony that all of these millions of dollars

2  that you got as a result of the activity we've been talking

3  about during this trial were just the result of accidents or

4  mistakes?

5  A.  Say that again.

6  Q.  Is it your testimony that all these millions of dollars that

7  you've gotten as a result of the activities that we've been

8  talking about during this trial were simply the results of

9  accidents or mistakes?

10 A.  Well, the millions of dollars came from the personal care

11 agency that we owned -- that I owned and I had clients.  So the

12 millions of dollars came from the agency.  The agency made a lot

13 of money.

14 Q.  And that came from billing the maximum amount each week for

15 each client regardless of whether you had a timesheet or what it

16 said, right?

17 A.  It wasn't like, oh, let's bill the maximum purpose no matter

18 what's being done, but it came from the work being done.

19 Q.  But again, the only way to know what work is being done is

20 by reviewing the timesheets, right?

21 A.  Correct.

22 Q.  And you just testified you weren't doing that before

23 billing, right?

24 A.  No, I didn't testify I wasn't checking the timesheets.  I

25 checked the timesheets.

157

1  Q.  Mr. Monroe, you testified earlier today to this jury that

2  you collected Phillip Daniels's timesheets and let them sit in a

3  stack reviewing them after the billing occurred?

4  A.  No, my testimony was that I got timesheets, then put my

5  employees outside of Phil that dropped off their timesheets.

6  When I did payroll, I went over their timesheets to make sure we

7  were paying them according to the work that they had done.  And

8  I let all the timesheets stack up until I had time to file them

9  in the client's file.  That was my testimony.

10 Q.  And your testimony was that regardless of when you found the

11 time to do that, you were having Tammy bill the maximum number

12 of units every week, right?

13 A.  She just billed every week.

14 Q.  Because you asked her to do that, right?

15 A.  Well, no, I didn't ask her to do it.  We was partners.  She

16 wanted to do billing, and I already had enough to do anyway, so

17 I never wanted -- One time I asked her would she teach me to do

18 billing.  She wrote some stuff down.  I think she was in town at

19 the time.  That was probably when we first opened the agency.  I

20 never went over the paper, never took time to do it.  I had

21 enough to do.  She had enough to do, so we did our perspective

22 jobs the best we could.  And as much as we could we got done.

23         We made sure important things got done.  Things that

24 wasn't as important like the timesheets being filed in the

25 folder, I probably let that stack up.  Again, I just had a lot

158

1    of work.

2    Q.  Mr. Monroe, you knew that Tammy Virgil was billing Medicaid

3    according to the number of units allotted a client and not the

4    timesheets?

5    A.  I knew she billed according to the units.

6            MS. LOUNSBERRY:  Nothing further.

7            THE COURT:  Mr. Fahl, follow up?

8            MR. FAHL:  No thank you, Your Honor.

9            THE COURT:  All right.  So is Mr. Monroe free to step

10   down?

11           MS. LOUNSBERRY:  Yes, Your Honor.

12           THE COURT:  Go ahead, Mr. Monroe.

13           (Witness excused.)

14

15

16

17

18

19

20

21

22

23

24

25

159

C E R T I F I C A T E


        I, SUSAN ARMBRUSTER, RPR, RMR, FCRR, Official Court

Reporter for the United States District Court for the Eastern

District of Wisconsin, do hereby certify that the foregoing

pages are a true and accurate transcription of my original

machine shorthand notes taken in the aforementioned matter to

the best of my skill and ability.


Signed and Certified December 1, 2025.

/s/Susan Armbruster

Susan Armbruster


                    Susan Armbruster, RPR, RMR, FCRR
                    United States Official Reporter
                    517 E Wisconsin Ave., Rm 200A,
                         Milwaukee, WI 53202
                    Susan_Armbruster@wied.uscourts.gov